**UNITED STATES of America**

v.

**Steven CAMACHO and Jaime Rodriguez, Defendants.**

**No. S1294CR313CSH.**

United States District Court, S.D. New York.

March 13, 2002.

---

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Defendants Steven Camacho and Jaime Rodriguez have made a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the basis of newly-discovered exculpatory evidence. This evidence consists of declarations made by Gregory Cherry, originally indicted as a codefendant of Camacho and Rodriguez, to Christopher Thomas, a fellow prison inmate. The Court first considered defendants' motions in an Opinion dated October 1, 2001, familiarity with which is assumed. *U.S. v. Camacho*, 163 F.Supp.2d 287 (S.D.N.Y.2001). The Court determined that it had jurisdiction under Rule 33 and denied defendants' request that Cherry be granted judicial immunity. Then after analyzing the admissibility of hearsay testimony by Thomas under Rule 804(b)(3) of the Federal Rules of Evidence and the standards for granting a new trial, the Court concluded that a hearing was necessary to decide whether the testimony would be admissible at a trial and, if so, whether a new trial is warranted on the basis of that testimony.

The Court held an evidentiary hearing on November 19, 2001, at which Thomas testified as a witness for defendants and was cross-examined by counsel for the government. Counsel subsequently served post-hearing briefs and offered oral arguments at a hearing on December 10, 2001. The government later sought to supplement the record with an affidavit signed by Thomas in another case, and the Court accepted the government's submission after giving defendants an opportunity to respond. *See* Order dated January 23, 2002.

At the conclusion of the evidentiary hearing, the Court asked counsel to address in their post-hearing briefs "the question of whether or not and for what purpose it is for the trial judge to evaluate the credibility of the witness" in a motion for a new trial based on the witness's proposed testimony. Hearing Transcript at 77. Counsel have dealt with this question in their post-hearing briefs and in their oral arguments, and it is to this question that I now turn. After determining the relevance of Thomas's credibility I will then be able to decide whether Thomas's testimony would be admissible at a trial and, if so, whether a new trial is warranted in this case.

I. *The Relevance of the Credibility of the Proposed Witness*

The Court's prior Opinion, 163 F.Supp.2d 287, 298–316, set out the standards for admissibility of testimony under Rule 804(b)(3) of the Federal Rules of Evidence and the standards for granting a new trial based on newly discovered evidence Rule 33 of the Federal Rules of Criminal Procedure. The following discussion will build on the Court's prior Opinion, avoiding repetition when possible.

In order for testimony by Thomas regarding Cherry's declaration to be

admissible at a trial as statements against penal interest under Rule 804(b)(3), there must be "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." Second Circuit precedent requires courts to consider the trustworthiness of the out-of-court declarant (Cherry), "as well as the trustworthiness of the declarations attributed to him," 163 F.Supp.2d at 302, an exercise involving the evaluation of the trustworthiness of the declaration itself, the circumstances under which it was given, and the presence or absence of other consistent evidence. The court is not permitted to consider the credibility of the in-court witness (Thomas) on the issue of his testimony's admissibility. *Id.* at 314.

Where, as in the case at bar, the proposed testimony of an in-court witness is offered as newly discovered evidence in support of a Rule 33 motion for a new trial, the proper assessment by the trial judge of the credibility of that witness poses a question upon which the present parties vigorously disagree. In *United States v. Gambino,* 59 F.3d 353 (2d Cir. 1995), the Second Circuit undertook to state the standard for granting a new trial in a criminal case based on newly discovered evidence:

> Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, *if believed,* change the verdict. *See United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982).

*Id.* at 364 (emphasis added). The parties dispute the meaning of the italicized phrase "if believed." Defendants interpret *Gambino* to mean that the trial court, when deciding a Rule 33 motion, must assume that the jury on a new trial *would* "believe" the newly discovered evidence (here the testimony of Thomas), thereby limiting the court's inquiry to whether that evidence could change the verdict to one of acquittal. The government interprets *Gambino* to mean that the court must evaluate whether the newly discovered evidence (again, the testimony of Thomas) is likely to be believed by the jury and, only if so, whether that evidence could change the verdict to one of acquittal

*United States v. Gilbert,* which the *Gambino* court cited as precedent for the applicable standard, does not resolve this question of interpretation because the opinion in *Gilbert* did not use the phrase "if believed." *See* 668 F.2d at 96 ("This Circuit's standard for granting Rule 33 motions is clear. Most pertinently, the new evidence must be such that it would probably lead to an acquittal."). Other Second Circuit cases state that defendants seeking a new trial must show that newly discovered evidence "would probably lead to an acquittal" and do not qualify that requirement with "if believed" or any similar language. *United States v. Gallego,* 191 F.3d 156, 161 (2d Cir.1999); *United States v. Zagari,* 111 F.3d 307, 322 (2d Cir.1997); *United States v. Spencer,* 4 F.3d 115, 118 (2d Cir.1993); *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d Cir. 1992) (citing cases dating back to 1851); *Gilbert,* 668 F.2d at 96; *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980); *see also United States v. Torres,* 128 F.3d 38, 49 (2d Cir.1997) (explaining that in cases of newly discovered evidence of perjury, where the prosecution was unaware of the perjury, defendants must show "that the jury probably would have acquitted in the absence of the false testimony") (internal quotations and citation omitted); *United States v. Sasso,* 59 F.3d 341, 350 (2d Cir. 1995) (same).

■ In *Gambino,* the defendant alleged that the government wrongly withheld exculpatory evidence. *Id.* at 364–67. In such circumstances, the burden on the defendant is slightly lower than when the exculpatory evidence was not in the government's possession. The defendant must show that there is a *reasonable probability* that the evidence could result in an acquittal. *See id.* at 365. As the Supreme Court explained in *Kyles v. Whitley,* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial. . . ." The court must determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *accord United States v. Coppa,* 267 F.3d 132, 140–42 (2d Cir.2001) (explaining required scope of disclosure by government under evolving Supreme Court precedent). Likewise, where "it can be shown that the prosecution knowingly used false testimony," courts apply a "less stringent test" than is ordinarily applied to motions based on newly discovered evidence and grant a new trial "where the jury 'might' have acquitted absent the perjury." *Sanchez,* 969 F.2d at 1414. On the other hand, in motions for a new trial based on newly discovered evidence which was not in the government's possession, the defendant must show that "the newly-discovered evidence could not have been discovered, exercising due diligence, before or during trial, and that evidence is so material and non-cumulative that its admission *would probably* lead to an acquittal." *Gallego,* 191 F.3d at 161 (internal quotation marks and citations omitted and emphasis added); *see also Torres,* 128 F.3d at 48–49; *United States v. Siddiqi,* 959 F.2d 1167, 1173 (2d

Cir.1992); *United States v. Alessi,* 638 F.2d 466, 479 (2d Cir.1980).

The only published Second Circuit case other than *Gambino* to use the phrase "if believed" in describing the standards applicable to Rule 33 motions is *United States v. Gonzalez,* 110 F.3d 936, 943 (2d Cir.1997) (also quoting *Gilbert* ). The motion for a new trial in that case was also based on evidence that the government failed to disclose to the defendant, and the court applied the "reasonable probability" test. *Id.* at 943–44. ("Evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result would have been different.")

■ While the precedent is not entirely clear on this point, I conclude that a trial court must assess the credibility of newly discovered evidence in deciding whether to grant a motion for a new trial. When a defendant has had a fair trial, with an adequate opportunity to present evidence in his defense, courts are extremely reluctant to grant a new trial. "[A] district court must exercise great caution in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only *in the most extraordinary circumstances."* *Spencer,* 4 F.3d at 118 (internal quotation marks and citations omitted).

■ In considering a motion for a new trial based upon asserted deficiencies in the evidence adduced at trial, a court may generally evaluate the evidence adduced and the credibility of witnesses who testified at the trial resulting in conviction. As the Second Circuit stated in *United States v. Sanchez:*

> By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. In exercising the discretion so con-

ferred, the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. To say that a trial judge cannot make his or her own evaluation of the testimony of a witness in the context of a Rule 33 motion is to ignore the overwhelming weight of authority to the contrary.

969 F.2d 1409, 1413–14 (2d Cir.1992) (internal quotation marks and citations omitted). Nevertheless, the court "generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility" unless "exceptional circumstances" are present. *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir.2001); *accord Sanchez,* 969 F.2d at 1414. "The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *Ferguson,* 246 F.3d at 133.

 No such deference can apply with regard to a motion for a new trial based upon newly discovered evidence, which by definition was not presented to the jury at trial. Since the jury did not have the opportunity to evaluate the new evidence, the court must assess the evidence on its own to determine the "probable" impact of the evidence upon a jury. The court is not required to limit its own evaluation in deference to the jury at a new trial, because the court must decide whether there should even be a new trial. The defendant has the burden of convincing the trial judge that the new evidence would probably result in an acquittal and therefore that justice requires a new trial. Given this heavy burden on the defendant and the reluctance of courts to grant new trials, it would not be appropriate for a court to assume that the new evidence proffered by the defendant would be believed by a jury. Only if the court believes, based on its own evaluation of the new evidence and the evidence presented at trial, that the new evidence would probably have resulted in a different verdict should the court award the extraordinary relief of granting a new trial.

The conclusion that a court should evaluate the credibility of newly discovered evidence in considering a motion for a new trial is supported by the language of decisions in other circuits. *See Casias v. United States,* 337 F.2d 354, 356 (10th Cir.1964) ("No one can doubt that a confession by another party to the crime for which the petitioner has been tried and convicted, if discovered after conviction, would be grounds for a new trial. The integrity of the confession is a matter within the province of the trial Court...."). *See also DeBinder v. United States,* 303 F.2d 203 (D.C.Cir.1962), where a convicted defendant proffered on his Rule 33 motion his twin brother's affidavit that the brother had committed the crime. Remanding the case to the district court for further proceedings, the court of appeals said:

> The credible confession of another to the commission of a crime for which an accused has been convicted is, of course, sufficient ground for a new trial. Here, however, the alleged confession itself, the circumstances surrounding its execution and the relationship of the parties concerned counsel caution lest the court be the victim of an imposition. This 'confession' should be tested in open court. The twin, Eugene Carl DeBinder, should be given the opportunity to appear and testify at a hearing on appellant's motion for new trial. The case if [sic] remanded accordingly. If a new trial is denied, the order of denial may be appealed.

*Id.* at 204 (footnotes omitted). This is the sort of hearing this Court held to hear the testimony of Thomas.

Rodriguez acknowledges in general terms that a court may evaluate the credibility of new evidence in deciding whether to grant a new trial. He contends, however, that once a court determines that a proposed out-of-court hearsay declaration is sufficiently reliable to be admissible under Rule 804(b)(3), the court must also regard as credible the in-court witness's testimony describing that declaration.

■ I reject this argument because it is a *non sequitur*. It does not necessarily follow from a court's conclusion that an out-of-court hearsay declaration would be admissible under Rule 804(b)(3) at a new trial that the court must also conclude that the testimony of the in-court witness describing that declaration is credible. Moreover, the requirement for admissibility under Rule 804(b)(3), corroboration of the hearsay declaration, is less searching and exacting than the Rule 33 requirement, where a court considering whether newly discovered evidence warrants a new trial must weigh all the evidence to determine the "probable" effect of the new evidence at a new trial. It seems to me plain that in performing that exercise, the trial judge must include an evaluation of whether the jury at a new trial would believe the witness through whose testimony the defendant seeks to place the newly discovered evidence before the jury.

Rodriguez argues that "[t]he jury is entitled to hear" defendants' exculpatory evidence. Brief at 4. But the question is not whether defendants would be entitled to offer the testimony at a new trial; rather, the question is whether defendants are entitled to a new trial at all.

■ Camacho argues that the credibility of a witness is no more relevant in a motion for a new trial based on newly discovered evidence than in other contexts where credibility determinations are left to the jury. For the most part, Camacho's comparisons are inapposite. First, Camacho relies on the law governing credibility determinations in the course of a trial. A judge may not ordinarily exclude hearsay testimony on the basis that the judge does not believe the in-court witness. *See United States v. DiMaria*, 727 F.2d 265, 271–72 (2d Cir.1984). Similarly, during trial a court should not prevent a witness from testifying unless "the testimony contradicts indisputable physical facts or laws" such that "reasonable men could not . . . believe[ ] the testimony. . . ." *United States v. Kuzniar*, 881 F.2d 466, 470–71 (7th Cir.1989). At oral argument, Camacho made the related point that, at trial, a court should not strike the testimony of a witness unless the testimony is incredible as a matter of law. Tr. at 10, 39–40.

It is true that during trial it is best to err on the side of allowing the jury to hear a proposed witness whose credibility is doubtful. The trial is only slightly longer as a result. The situation is entirely different when the jury has already returned a verdict and the court is determining whether it is worthwhile to conduct an entirely new trial on the basis of the testimony of proposed new witness. As explained *supra*, courts are extremely reluctant to grant new trials. Conducting a new trial requires much time and effort and delays final judgment.

■ Second, Camacho relies on the law governing credibility determinations in post-verdict motions that are not based on new evidence. I have previously discussed the effect of the different bases for a new trial motion upon the manner in which the court evaluates the motion. To restate those propositions: When a defendant makes a post-trial motion for a judgment of acquittal on the grounds that the evidence was insufficient to sustain a conviction, the court must defer to any rational

findings of fact, including credibility determinations, made by the jury. *See United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir.1992); *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985). When a defendant makes a motion for a new trial on the grounds that the verdict was contrary to the weight of the evidence, the court has more discretion than in the context of a motion for a judgment of acquittal to evaluate the credibility of witnesses; but nonetheless, the court should defer to the jury's assessment of witness credibility unless "exceptional circumstances" are present, *Ferguson*, 246 F.3d at 133–34; and this standard applies even if the trial judge believes that a witness committed perjury, *Sanchez*, 969 F.2d at 1413–14. But when a court assesses the credibility of newly discovered evidence, the court is not substituting its evaluation of the evidence for that of the trial jury's. As explained *supra*, the court must determine the probable impact of the new evidence on a jury in order to decide whether a new trial is even warranted. This analysis requires an evaluation of the credibility of the new evidence compared with the evidence presented at trial.

Finally, Camacho relies on the law governing credibility determinations in post-verdict motions that are based new evidence which the government failed to disclose during trial, citing *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). As explained *supra*, when a defendant is wrongfully deprived of an opportunity to present evidence at trial, he bears a lesser burden on a motion for a new trial than he would if he had a fair opportunity to present evidence at trial.

Camacho cites a case in which the Second Circuit did in fact evaluate the credibility of the new evidence proffered by the defendant in support of a motion for a new trial. In *Rivalta*, the Second Circuit upheld the district court's denial of a motion for a new trial on the basis of newly discovered testimony, because the proposed witness's testimony was "highly suspect" and, when introduced in the trial of a co-defendant, was rejected by the jury and therefore was "unworthy of belief." *United States v. Rivalta*, 892 F.2d 223, 228 (2d Cir.1989).[1] Camacho also cites a Second Circuit case in which the court evaluated the credibility of the new evidence even though the defendant alleged that the government wrongfully withheld the evidence. *United States v. Wong*, 78 F.3d 73 (2d Cir.1996). As to the first piece of new evidence, the court held that the evidence was cumulative impeachment of well-corroborated testimony and therefore that it was "probable that the evidence ... would not have altered the outcome of the trial." *Id.* at 80. As to the second piece of new evidence, the court held that the evidence was not "credible" because it "relie[d] on *post hoc* reasoning ... unsupported by a chronology of events;" furthermore, the evidence was cumulative impeachment evidence and therefore there was no "reasonable probability" that it would result in a different verdict. *Id.* at 80–81.

Since I must determine whether defendants have shown that the testimony of Christopher Thomas would probably result in a different verdict at trial in order to decide whether to grant defendants' request for a new trial, I conclude that I

---

**1.** Camacho also cites another case in which the court evaluated the "weight" of newly discovered evidence. *United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir.1995). In that case, the evidence concerned the defendant's competency to stand trial, which is a question for the judge, not the jury. Therefore, it does not shed light on the issue of whether the court may evaluate the credibility of proposed trial witnesses in deciding a motion for a new trial.

must evaluate the credibility of Thomas and weigh the credibility of his testimony, together with the credibility of Cherry's asserted declarations to Tomas, against the credibility of contrary evidence presented at trial. Before deciding whether a new trial is warranted, however, I must first consider whether Cherry's hearsay declarations (as testified to by Thomas) would be admissible at a trial.

## II. *Admissibility of the Testimony at a Trial*

 The government makes the argument that, because Thomas's credibility is relevant to the issue of whether to grant a new trial, the Court should also evaluate Thomas's credibility in determining whether Cherry's hearsay declaration would be admissible at trial. Such an approach would be contrary to Second Circuit precedent: "In determining whether such a statement is trustworthy enough to be admissible, .... the court should not look to the credibility of the in-court witness." *United States v. Casamento*, 887 F.2d 1141, 1170 (2d Cir.1989). The government does not cite any authority for the proposition that the standards for admissibility under Rule 804(b)(3) are different in the context of a motion for a new trial than they are during a trial, and I find no persuasive reason to modify the established standards. Accordingly, I will disregard the government's arguments regarding the credibility of Thomas in deciding whether Cherry's declaration would be admissible at trial.

Rule 804(b)(3) of the Federal Rules of Evidence permits the admission into evidence of a hearsay declaration by an un-

available declarant if the statement was against the declarant's penal interest and "corroborating circumstances clearly indicate the trustworthiness of the statement." The hearsay declaration at issue is Cherry's comment to Thomas in June of 1998 that Camacho was in prison for murders committed by Cherry. It is undisputed that Cherry would be unavailable as a witness at trial if he invoked the Fifth Amendment and that his declaration to Thomas was against his penal interest. The critical question is whether there are circumstances clearly corroborating the reliability of Cherry's declaration.

The Court's prior Opinion, 163 F.Supp.2d at 299–310, discussed in depth the factors that are relevant in an analysis of corroborating circumstances. I will summarize parts of that discussion here only as necessary to explain my conclusions. I will first consider whether there is clear corroboration for Cherry's reliability, evaluating the circumstances of his declaration, and then I will consider whether there is clear corroboration for the reliability of the declaration itself, evaluating whether there is other consistent evidence. As I must, I will assume, for purposes of deciding the admissibility of Cherry's declaration, that Thomas's testimony regarding his conversation with Cherry is truthful.

The background and circumstances of Cherry's conversation with Thomas were as follows.[2] Cherry was originally indicted along with Camacho, Rodriguez, and fourteen other defendants on May 25, 1994. Camacho and Rodriguez were charged with the January 2, 1993 murders of Hector Ocasio and Gilberto Garcia and the

---

**2.** The facts relating to Thomas's relations with Cherry and Camacho are drawn from Thomas's testimony at the hearing on November 19, 2001 and Thomas's affidavit of July 14, 2000. The facts relating to Cherry's statements to police and the government are drawn from the affidavit of Robert Addolorato dated June 7, 1999, submitted with the government's memorandum of law in opposition to defendants' motion.

attempted murder of Luis Garcia (collectively the "Ocasio/Garcia murders"). The other defendants charged with those crimes were Angel Padilla, James Albizu, and Rafael Torres, but not Cherry. Padilla was tried separately from Camacho and Rodriguez and was convicted of the Ocasio/Garcia murders, along with other crimes, on May 16, 1995. Camacho and Rodriguez were convicted by a jury on June 26, 1996. Albizu testified against them at the trial. Pursuant to his cooperation agreement, most of the charges against Albizu were dropped and he was sentenced to time served plus sixty days on June 24, 1998. Torres accepted a plea bargain and was sentenced to fifteen years in prison on September 3, 1997. Cherry accepted a plea bargain and was sentenced to twenty-five years in prison on September 17, 1998.

Cherry had been arrested on March 30, 1993 and gave a detailed statement to police on that day. He told the police that Camacho and Trumont Williams committed the Ocasio/Garcia murders. Cherry had been shot on Ocasio's order. He said that he had been approached twice by Camacho, Albizu, and two of Camacho's friends about the planned murder of Ocasio, once before being shot and once after. Cherry said that he told them he did not want to be involved. He said that Camacho and Williams told him about the murders afterward. Cherry also told the police on March 30 about six other murders and identified the people who had committed those murders.

In 1996, Cherry attempted to cooperate with the government and participated in three proffer sessions between February 22 and 27. Cherry said that everything in his statement on March 30, 1993 was true, *except* that he admitted that he had falsely accused others of two murders (unrelated to the murders at issue in the present case) that he had in fact committed. The government does not explain the circumstances of these recantations; one can only suspect that Cherry changed his story upon being confronted with evidence against him.

In the fall of 1997, Cherry met separately with Rodriguez and Joyce London, Rodriguez's attorney, at the Metropolitan Correctional Center. *See* London Aff. dated Nov. 5, 1998; Rodriguez Aff. dated Apr. 24, 1998. Cherry said that he knew which two people had committed the Ocasio/Garcia murders and that Rodriguez and Camacho had no involvement in them. He said that prior to the shooting, Albizu, the two shooters, and the driver were in a car together, with no one else; that Albizu then left the car to stand around the corner from where the shooting was to take place; and that the two shooters then left the car to commit the shooting. According to London, Cherry implied that he was one of the shooters but stopped short of making a clear admission. Cherry volunteered to testify for Camacho and Rodriguez and exonerate them, but only if he was given immunity for his testimony. Cherry repeated these statements to London in the fall of 1998. In April of 1999, Camacho and Rodriguez filed a motion requesting the Court to grant Cherry judicial immunity. That motion was denied in an Opinion issued December 1, 1999. *U.S. v. Camacho*, 1999 WL 1084229 (S.D.N.Y.1999).

Christopher Thomas first met Camacho in 1993 when they both were pretrial detainees in the same unit at the Federal Correctional Institution in Otisville, New York. In 1998, Thomas was back in Otisville serving a sentence, and Camacho and Cherry were both there also, awaiting trial and sentencing, respectively. Thomas met Cherry that year in the prison law library. Cherry was working there as a clerk, and Thomas frequented the library on a daily

basis and assisted many of his fellow prisoners with their legal work. Thomas agreed to help Cherry with preparing objections to Cherry's presentence report. That report was typed by Thomas and mailed on May 29, 1998.

According to Thomas, one day when Thomas was working in the library with Cherry, Camacho walked in. Thomas noticed that Camacho looked in their direction and did not greet them, and Thomas assumed that Camacho didn't recognize him. Thomas remarked to Cherry that he knew Camacho. Cherry responded that Camacho was his co-defendant and was there for something that Cherry did. When Thomas asked Cherry what he meant, Cherry said "bodies." Cherry also mentioned that he had told an attorney that Camacho and another person were innocent of the charges against them. Thomas left Otisville in mid-June of 1998. He did not tell Camacho about Cherry's statements to him before leaving. He explained at the hearing on November 19, 2001 that he had no reason to tell Camacho because Cherry said that he had already told an attorney that Camacho was innocent.

Two years later, Thomas was back in Otisville from July 6 to July 18, 2000, and he was assigned to the same unit as Camacho. On July 13, Camacho recognized Thomas and started talking with him. Camacho mentioned that he was facing a life sentence, and Thomas told him about his conversation with Cherry in 1998. The next day, July 14, Thomas prepared an affidavit for Camacho about Cherry's statements.

▮ I find that the circumstances of Cherry's declaration to Thomas provide sufficiently clear corroboration for its reliability. Cherry denied participation in the Ocasio/Garcia murders during his interviews with police and prosecutors, which took place before the trial of Camacho and Rodriguez, but those denials lacked any credibility. In Cherry's first statement to police, he did not claim responsibility for any of the six murders he described, but then he had to admit in his later conversation with prosecutors, presumably in the face of hard evidence, that he had in fact committed two of those murders. Furthermore, the government's evidence at trial showed that Cherry was more involved in the Ocasio/Garcia murders than he admitted to the police. According to the testimony of the government's witnesses, Cherry helped Albizu and Williams hijack a second get-away car on the day of the murders and then fled the scene in that car with Williams, who all agree was one of the two shooters. The circumstances show that in his statements to police and prosecutors, Cherry minimized his involvement in crimes as much as he thought he could get away with.

One year after the trial of Camacho and Rodriguez, and again the next year, Cherry implied to Rodriguez and London that he was responsible for the Ocasio/Garcia murders, but Cherry would not make a more definite statement without the protection of immunity. Cherry's actions are susceptible to two equally plausible interpretations. Either he really was the second shooter in the Ocasio/Garcia murders, did not want to see Camacho and Rodriguez go to prison for his crime, but also did not want to risk being prosecuted for that crime himself; or ·he was not the second shooter but wanted to help his codefendants overturn their convictions without risking prosecution himself.

Cherry's conversation with Thomas, assuming as I must for the present discussion that it took place as Thomas described it, is consistent with the first interpretation, that he was the second shooter in the Ocasio/Garcia murders but did not want to

risk prosecution to help Camacho and Rodriguez. Cherry was talking to someone he probably thought he could trust, a fellow prison inmate who was helping him prepare for his sentencing. When Thomas noticed Camacho, Cherry identified him as his codefendant and commented, without being asked, that Camacho was convicted for a crime that Cherry committed. Cherry also explained that he had told an attorney that Camacho and another person were wrongly convicted, a reference to his contacts with Rodriguez and London.

In these circumstances, there are strong reasons to believe that Cherry was telling the truth to Thomas. Cherry's credibility may be generally low, considering the fact that he is a convicted felon and that he was willing to lie to police when it suited his purposes. Also, since Cherry, Camacho, and Rodriguez had all been convicted before Cherry's declaration to Thomas, Cherry did not subject himself to a great risk of prosecution by making the declaration, especially considering that Cherry had already hinted to London that he was a responsible for the Ocasio/Gilbert murders with the full expectation that she would disclose her conversation with him to the government. There is little reason to believe, however, that Cherry was lying to Thomas. He likely saw Thomas as an ally. He was not prompted to talk about his role in the Ocasio/Garcia murders. His declarations to Thomas are consistent with and refer to his earlier contacts with Rodriguez and London. Furthermore, Cherry's declarations to Thomas cannot plausibly be construed as an effort to provide exculpatory material to help Camacho and Rodriguez. Thomas testified that he believed that Camacho did not recognize him, and it would not have appeared to Cherry that Thomas and Camacho were well acquainted.

The government contends that Cherry would have expected Thomas to use his statements to help Camacho overturn his conviction because Thomas had a reputation as a jailhouse lawyer. This conclusion is not strongly supported by the circumstances, as described by Thomas. First, as already noted, Camacho and Thomas did not appear to be well acquainted. Second, Cherry mentioned to Thomas that he had told the information to an attorney, which would imply to Thomas that the information had already been conveyed to the Court for defendants' benefit. Third, the fact that Thomas has helped, in his own estimation, thousands of inmates with their legal work does not strongly support the conclusion that Cherry would expect Thomas to testify about his statements in Camacho and Rodriguez's case. Apart from this case, Thomas has testified in three cases and offered affidavits in two other cases, conveying out-of-court declarations to exculpate the defendants in those cases. All of those instances but one were after Thomas's conversation with Cherry. Thus Thomas may have had a reputation in July of 1998 for helping inmates research and draft legal papers, but he would not have had a reputation for testifying in court about information he learned from fellow inmates.

The government also argues that it is not believable that Thomas would wait two years before telling Camacho what he learned from Cherry. I disagree. The following facts provide ample explanation for the delay: Thomas and Camacho did not know each other well, Cherry commented that he had conveyed the information to a lawyer, and Thomas left Otisville within a couple of weeks after his conversation with Cherry. Besides, the credibility of Thomas's account of events is not a matter for consideration in connection with the issue of admissibility. I must concern myself at this point only with the circum-

stances that indicate whether or not Cherry was telling the truth.

An additional argument made by the government is that, since Cherry had offered to testify on behalf of Camacho and Rodriguez, one would expect Camacho to be friendly to Cherry, not ignore him, upon encountering him in the library. Again, this matter goes to the credibility of Thomas's account of events, not to the credibility of Cherry.

Finally, the government presses its theory that Thomas, Cherry, and Camacho colluded to fabricate Thomas's affidavit as a back-up plan in the event that defendant's request for judicial immunity for Cherry failed. The government points out that defendants' immunity request was denied in December of 1999, and Thomas wrote his affidavit in July of 2000. The primary reason that this argument fails is that in deciding the admissibility of Thomas's testimony, I must assume that Thomas is telling the truth. Secondarily, while it may be plausible that Thomas and Camacho colluded in drafting Thomas's affidavit in July of 2000, it is entirely implausible that they had a scheme with Cherry dating back to May or June of 1998. First, if Cherry wanted to make a statement to be used as hearsay evidence by defendants, he could simply have made a more definite statement to London. Second, there is no indication that Thomas had an enduring friendship with Cherry or Camacho such that they would have stayed in contact over a period of two years. Thomas left Otisville in mid-June 1998, only a couple of weeks after the date of his conversation with Cherry. By coincidence, Thomas was back in Otisville and assigned to the same unit as Camacho for twelve days in July of 2000. There is nothing to support the theory that in 1998 Camacho and Thomas planned to meet, with or without Cherry, after the Court made a decision on defendants' request for immunity.

 Even if the corroboration provided by the circumstances of Cherry's declaration is not especially strong, the corroboration provided by evidence at trial more than makes up for any deficiency. The surviving victim, Luis Garcia, testified that Williams and Cherry were the shooters. In addition, the government's evidence shows that Williams and Cherry were being targeted by Ocasio and that Cherry was deeply involved in planning the murder of Ocasio, to such an extent that a plan to commit the murder in December of 1992 was called off because Cherry failed to appear. Also, the government's evidence suggests that Cherry collaborated with Albizu and Williams on the afternoon of the shootings to hijack a second get-away car and that Williams and Cherry fled the scene of the murder together in that car. This amount of corroboration, from both defendants' evidence and the government's evidence, easily meets the threshold of "clear" corroboration.[3]

The government argues that Cherry's declaration to Thomas is not clearly corroborated by other evidence, because it contradicts the testimony of the two main government witnesses, Albizu and Douglas Welch, which the jury accepted at trial. This argument has no persuasive force. The usual purpose of evidence presented by a defendant in a criminal case is to contradict the government's evidence; and

---

**3.** I do not find any significant corroboration in the letter submitted by defendants from Joey Pillot to Wilson Rodriguez, both originally indicated as defendants in this case. That letter states, "As for Lil Spanky [Camacho] & his crew I don't know what they did so I can't speak about it." Pillot was trying to persuade Rodriguez that he was not cooperating with the government. There is no evidence that Pillot was involved in the Ocasio/Garcia murders other than the early discussions several weeks before the murders.

in a defendant's motion for a new trial, the quintessential purpose of new evidence is to contradict evidence which was accepted by the jury at trial. In order to be admissible, Cherry's declaration need not be more believable than contrary government evidence. Rather, it must be "clearly corroborated" by some other evidence. That standard is satisfied.

For the foregoing reasons, I hold (without evaluating the credibility of Thomas) that Cherry's declarations as described by Thomas would be admissible at a new trial.

### III. *Whether a New Trial is Warranted*

At the next stage of analysis, in deciding whether to grant a new trial, I will weigh the government's evidence against the defendants' evidence, including Thomas's testimony. In weighing the evidence, I will not defer to the jury's ultimate finding of guilt, which necessarily entailed an acceptance of the government's evidence and a rejection of the defendants' evidence, because the jury did not have the opportunity to hear the newly discovered evidence which forms the basis for defendants' motion for a new trial.

 Defendants are entitled to a new trial only if Thomas's testimony, if introduced at trial, would probably create a reasonable doubt in the minds of the jury, resulting in an acquittal. *See United States v. Spencer,* 4 F.3d 115, 118–19 (2d Cir.1993).[4] The likely effect of Thomas's testimony depends on the credibility of

Thomas as a witness, the credibility of what Cherry said to Thomas as recounted by Thomas, the strength of the government's case against the defendants, the strength of the evidence presented by defendants, and the strength of evidence presented by either party that corroborates Thomas's testimony.[5]

### A. *The Trial Evidence*

The government charged Camacho and Rodriguez with conspiracy to murder Hector Ocasio, the murders of Hector Ocasio and Gilberto Garcia, and the attempted murder of Luis Garcia, all in aid of the C & C racketeering enterprise, in violation of 18 U.S.C. § 1959; the government also charged Camacho and Rodriguez with using and carrying firearms during those crimes in violation of 18 U.S.C. § 924. The government's principal witnesses were James Albizu, a member of the C & C gang, and Douglas Welch, a car service driver.

Albizu testified about how the plan to murder Ocasio was formed. Angel Padilla and George Calderon were the cofounders of the C & C gang in the Bronx. Some of the longstanding members of the C & C security force were Albizu, Joey Pillot, Trumont Williams, and Gregory Cherry. Camacho and Rodriguez used to sell drugs in the gang's neighborhood and were friendly with Albizu. After Calderon was killed, Padilla told the members of his

---

4. While the parties all cite the correct standard governing a motion for a new trial based on newly-discovered evidence, the government and Rodriguez repeatedly phrase their arguments in terms of the sufficiency of the evidence presented at trial, a standard applicable to a motion for a judgment of acquittal under Rule 29(c). In the latter type of motion, "the district court must view the evidence in the light most favorable to the government." *United States v. Ferguson,* 246 F.3d 129, 139 n. 1 (2d Cir.2001). By con-

trast, in considering a motion for a new trial based on newly-discovered evidence, the court weighs all the evidence to determine what effect the new evidence would likely have.

5. The careful reader will have realized that the phrase "Thomas's testimony" includes Thomas's description of what Cherry said to him.

security force to keep a low profile and brought in a new head of security, Hector Ocasio, who hired new security members. Soon, Padilla and several longtime members of his security force, including Albizu, Pillot, Williams, and Cherry, began to distrust Ocasio. Ocasio had reduced weekly salaries and then cut several security members from the payroll. He also had given local drug dealers permission to shoot Williams and Cherry.

According to his testimony at trial, Albizu conceived of a plan to murder Ocasio, and he discussed his plan with Pillot, Williams, and Cherry. He also discussed his plan with Camacho and Rodriguez. In late December of 1992, Albizu, Williams, Cherry, Camacho, Rodriguez, and a cousin of Rodriguez's agreed to meet to kill Ocasio, but the plan fell through when Cherry failed to appear. On January 2, 1993, Camacho and Rodriguez told Albizu that they had been unable to reach Williams to retrieve from him a gun, a TEC–9, that they had given him at their last meeting in December. Albizu, Camacho, and Rodriguez walked to Williams' house. Williams told them that he had left the gun in the car of a car service driver, referring to Douglas Welch. Rodriguez said that they would need to use the gun, and Williams called Welch to come meet them. Williams asked when they were going to kill Ocasio, and Albizu suggested that he go pick up his pay and see if Ocasio was around.

Albizu and Welch both testified about what happened on January 2, 1993, between the time Welch arrived at Williams' house and the time the murders took place at 139th Street and Brook Avenue. Tr. at 787–832 (Albizu), 1306–64 (Welch). While Albizu and Welch corroborated each other in the most important respects, see *U.S. v. Camacho*, 1998 WL 472844, at *3 (Aug. 10, 1998), there were enough discrepancies

that their testimony should be summarized separately.

Albizu testified first. He said that he had left his car, a white Maxima, on 137th Street when he walked with Camacho and Rodriguez to Williams' house. Albizu explained that he had previously hijacked the car from a drug dealer named Bucky. Albizu had gotten in the car and driven with Bucky on the Bruckner Expressway, telling him that they were going to a hotel. Then Albizu had changed course and driven to Bucky's house, where Albizu had left Bucky after taking drugs, money, and the keys to the Maxima.

When Welch arrived at Williams' house, driving a burgundy Pathfinder, Albizu, Williams, Camacho, and Rodriguez all got in the car, Williams in the front passenger seat. At that point, Albizu had a 9 m.m. Smith & Wesson gun, and Camacho had a 9 m.m. Ruger gun. They went to Brook Avenue and 138th Street, where Albizu got out of the car to collect his pay from Ocasio. Ocasio told Albizu that he was still angry at Williams. At this point, it was around 7:00 p.m.

When Albizu returned to Welch's Pathfinder, the group drove to 148th Street in Manhattan so that Williams could pick up some marijuana, with Albizu's money. While Williams was out of the car, Albizu questioned Welch about what happened to the TEC–9, and Welch told him that Williams had sold him the gun and he had left it at his uncle's house in Mount Vernon. (Welch had actually resold the gun.) After Williams returned to the car, they drove around Manhattan while Albizu and Williams argued. Albizu refused to loan his gun to Williams so that Williams could shoot Ocasio, because Albizu did not trust him to return it.

They next drove to where Albizu's Maxima was parked in the Bronx, on 137th Street between Brook Avenue and St.

Ann's Avenue. Albizu took both guns to hide them behind the tires of the Maxima and told Williams, Camacho, and Rodriguez that he was going to go collect some money. The Pathfinder drove off. Albizu walked to 138th Street and extorted money from some people there. While Albizu was still on 138th Street, the Pathfinder pulled up, and Rodriguez got out to ask Albizu for the keys to the Maxima. Rodriguez said that Williams and Camacho were getting ready to shoot Ocasio. Albizu said that the guns were behind the tires and told Rodriguez not to give his gun to Williams. Rodriguez got back in the Pathfinder, and the car left.

Albizu walked around a little on 138th Street and watched the Pathfinder circling. He heard the sound of multiple gunshots coming from 139th Street and Brook Avenue. He then got into the car of a friend who was driving by and left the area. Later when he stopped by Rodriguez's apartment on Arthur Avenue, no one was there. He saw Williams, Camacho, and Rodriguez the next day, and they described to him how Camacho and Williams had shot Ocasio and two others. Camacho returned the Smith & Wesson to Albizu. Williams said he lost Camacho's Ruger.

On cross-examination, Albizu said that he had not seen Cherry since two weeks earlier in late December when they were planning the murder. Tr. at 933–34. He also said that Ocasio only told him that he was still mad at Williams, not mentioning Cherry. Tr. at 933.

Welch testified at trial that he was dispatched to Williams' house at 5:05 p.m. on January 2 and that he was driving a Nissan Pathfinder with tinted windows. Albizu, Williams, Camacho, and Rodriguez got in the car, Camacho in the front passenger seat. Albizu had a black 9 m.m. gun, Camacho had a Ruger 9 m.m. gun with a black handle, and Rodriguez had a silver .44 gun. Williams told Welch that they wanted to hire him to be on hold for around five hours. Williams or Albizu asked Welch where the TEC–9 was, and Welch said it was at his uncle's house in Mount Vernon.

Welch first drove the group to Alexander Avenue so they could get another gun. Albizu and Williams left and returned ten minutes later, apparently without a gun. Welch next took them, after driving around for a short while, to an apartment building on Arthur Avenue. Rodriguez went inside and handed a box of bullets out a window to Camacho.

After driving around for another half hour, they next stopped near Brook Avenue and 139th Street. Albizu and Williams got out of the car and walked away. About fifteen minutes later, Albizu and Williams approached a white Maxima car in the street. Albizu grabbed the driver and pushed him into the passenger seat, getting into the driver's seat himself, and Williams got into the back seat. A blue Lincoln pulled up, and the two men inside talked with Albizu and Williams. The Maxima then led the Lincoln and the Pathfinder to the Pelham Gardens hotel, by way of the Bruckner Expressway. There, Albizu pistol-whipped the driver of the hijacked car. The Maxima then led the Pathfinder to an apartment building on the Grand Concourse, again by way of the Bruckner Expressway; the Lincoln departed along the way. Albizu went upstairs with the driver of the hijacked car for about ten minutes; when they came back down, Albizu got back into the Maxima with Williams and the driver stayed behind.

The Maxima and the Pathfinder next drove to Brown Place, which is one block west of Brook Avenue and runs south of 138th Street. Albizu parked the Maxima and put his gun in the wheel well. Albizu

and Williams then rejoined Camacho, Rodriguez, and Welch in the Pathfinder. They circled the neighborhood around Brook Avenue and St. Ann's Avenue for about fifteen minutes, then returned to the Maxima so Albizu could retrieve his gun. They then drove to Layton Avenue, which is about seven miles away, and stopped while Albizu and Williams argued. Albizu refused to give Williams his gun and got out of the car. Welch then drove Williams, Camacho, and Rodriguez back to the neighborhood of Brook Avenue and 139th Street, where Williams, Camacho, and Rodriguez pointed out the person whom they were planning to shoot in front of a liquor store.

Welch parked the car down the block, with the motor running. Williams and Camacho prepared their guns, pulled up their sweatshirt hoods, and got out of the car. Welch and Rodriguez watched out the rear of the car while Williams and Camacho ran to the corner of Brook Avenue and 139th Street and fired their guns. Camacho ran back to the car and told Welch to get on the Bruckner Expressway. Camacho described how he and Williams had shot the victims.

They went to the apartment on Arthur Avenue where they had been earlier in the day. After ten minutes, Williams showed up, and they all talked about the shooting. They left the guns at the apartment and got back in the car, and Welch drove them past the scene of the shooting. Afterwards, Welch dropped off Williams and

then Camacho and Rodriguez and then went his own way.[6]

After the first day of Welch's testimony, the government called him again the next day to supplement his testimony. He stated that he remembered, after being reminded by the government the previous evening, that he had seen Cherry the evening of the murders. First, Cherry was present during the carjacking. He got in the back seat of the Maxima with Williams and rode along to Pelham Gardens and the apartment building on the Grand Concourse. While the Maxima was driving along the Grand Concourse, Cherry shot his gun out the window. Welch did not remember whether Cherry was still with the group when Albizu parked the Maxima at Brown Place, but he was certain that Cherry was not with the group by the time they stopped at 139th Street and the shooting took place. Welch also remembered that Cherry was standing on the sidewalk at the Arthur Avenue apartment, next to the white Maxima, when Welch arrived with Camacho and Rodriguez after the shooting. Welch asked Cherry if he could buy some of the stereo equipment in the Maxima. Welch also remembered on the second day of his testimony that he had taken the Maxima for a test drive at Brown Place.

On cross-examination, Welch admitted that he did not mention Cherry to detectives who interviewed him a few days after the murders. Tr. at 1377–78. He also

---

**6.** Rodriguez argues that there was "never any evidence" at trial to establish that Rodriguez aided and abetted the murders. Oral Arg. Tr. at 26. Such an argument is appropriately made in a motion for a judgment of acquittal, not in the present context. The pertinent question on this motion is whether new evidence would likely change the jury's finding that Rodriguez aided and abetted the murders. But I think it worthwhile to note that I do not regard the jury's finding at trial as unsupported by sufficient evidence. For example, there was evidence that Rodriguez obtained bullets from his own apartment for the shooting and retrieved the guns from Albizu's car immediately before the shooting. The fact that the two main government witnesses did not *both* testify to all the facts showing Rodriguez's participation does not make the evidence insufficient to support the jury's finding.

said that he had held some of the guns belonging to Albizu, Camacho, and Rodriguez when he was with them the day of the murders. Tr. at 1381–82.

In summation, the government urged the jury to find Welch's version of the facts more accurate than Albizu's version. The government suggested that Welch may have remembered what happened on January 2 more vividly than Albizu, because the events were exciting for Welch but almost routine for Albizu, who had been involved in numerous murders and other violent crimes.

The defense attacked the credibility of Albizu and Welch principally by calling attention to the ruthless, self-serving acts committed by Albizu in connection with prior crimes and by arguing that Albizu and Welch were providing testimony to please the prosecutors in order to obtain leniency.

Defendants' key witness was the surviving victim of the shootings, Luis Garcia. Tr. at 1599–1639. Garcia testified that he saw Williams and Cherry, not Williams and Camacho, commit the shootings. He said that Williams shot him and that Cherry shot Ocasio and Gilberto Garcia. He admitted that he only glimpsed the shooters in the brief moment after he was shot in the back, as he turned and fell to the ground, and that he only saw the profile of the shooter whom he identified as Cherry. He also testified that he encountered Cherry several days after he was released from the hospital and that Cherry told him that he was not the intended target of the shootings.

To discredit Garcia, the government argued that he had had no real opportunity to see the shooters.[7] The government also pointed to ballistics evidence to show that Garcia was mistaken about who was shot by Williams and who was shot by the second assailant. A ballistics expert testified that Luis Garcia and Gilberto Garcia were struck by bullets from the same gun. Tr. at 1210. In addition, the government called as witnesses a detective who had interviewed Garcia one week after the murders and a detective who had interviewed Garcia three months after the murders. Garcia told both of them that he did not know who the shooters were. Tr. at 1661, 1677. The first detective thought Garcia was not being forthcoming, because Garcia said he had heard one of the shooters say to the other shooter, "What the fuck did you shoot Luis for?" The fact that one of the shooters knew Garcia's first name indicated to the detective that Garcia was familiar with the shooters. Tr. at 1662. The second detective also admitted, on cross-examination, that he felt that Garcia should have known who shot him. Tr. at 1684.

Each defendant called an alibi witness at trial. Venero Jimenez testified that Camacho was visiting his mother in Florida from a few days after Christmas in 1992 until approximately three weeks later. Tr. at 1494–99. Nancy Melendez, Rodriguez's former girlfriend and the mother of his child, testified that Rodriguez came to her apartment the evening of January 1, 1993, and stayed the entire day and evening of January 2, 1993. Tr. at 1526–39.

The government undertook to show that Jimenez and Melendez were trying to help the defendants out of concern for them. When the government cross-examined Melendez, she admitted that Rodriguez

---

7. The government argues that the jury was *entitled* to discredit Garcia's testimony. This argument is appropriate in opposing a motion for a judgment of acquittal, not a motion for a new trial. The proper question here is whether the jury would probably have discredited Garcia's testimony if it also had heard Thomas's account of Cherry's declarations.

helped her remember what they did on January 2, 1993. Tr. at 1552. The government also argued that Melendez's assertion that she was never aware that Rodriguez was involved with drugs or guns was not believable in light of considerable evidence that Rodriguez was heavily involved with drugs and guns during his relationship with Melendez. To rebut Camacho's alibi defense that he was in Florida during the first weeks of January 1993, the government called as a witness a parole officer who testified that Camacho met with her in the Bronx on January 6, 1993. Tr. at 1645. The government also introduced a court transcript showing that Camacho appeared in court in the Bronx on January 7, 1993.

Having summarized, as briefly as possible, the extensive evidence produced at trial, I now turn to the new evidence offered by defendants as a basis for their motion for a new trial; Thomas's testimony regarding his conversation with Cherry in the summer of 1998. In connection with the issue of admissibility, I have described the circumstances and content of that conversation. However, I have not previously discussed the credibility of Thomas as a witness. I turn to that issue now.

### B. *The Credibility of Thomas*

█ The credibility of Thomas poses this core question. Would the jury at a new trial believe Thomas's description of the statements Cherry made to him–statements that inculpate Cherry and exculpate Camacho and Rodriguez?

Defendants argue that Thomas's testimony at the November 19, 2001 hearing is completely plausible and the circumstances and timing of the events he described were independently corroborated, notably by Cherry's Pre–Sentence Report, which the government offered at the hearing. Furthermore, the dates that Thomas, Cherry, and Camacho were incarcerated at Otisville are verifiable. Finally, defendants argue that Thomas's account of Cherry's declarations to him is particularly believable, considering that Cherry made similar, but more guarded, statements to Rodriguez and London.

The government did not attempt to show that any part of Thomas's story was false or implausible. Rather, the government argued that Thomas was fabricating the entire story and cross-examined Thomas about his criminal history and the legal assistance he has provided to criminal defendants in other cases.

It became clear at the hearing that Thomas has made a career of criminal fraud. He began in 1986 with simple credit card fraud, using a stolen credit card to make a purchase. Numerous times since then, he has broken into mailboxes to steal credit cards and then charged several thousand dollars on each card. On multiple occasions, Thomas has devised schemes to obtain blank American Express money orders. He would call American Express, impersonating a money order agent, tell American Express that the address of the business had changed, and ask for blank money orders to be sent to the new address. He obtained $300,000 in one of these schemes and over $3.2 million in another scheme. One time, he even managed to implement such a scheme while in prison, using a system of three-way-calling with his former fiancé to place the order and arranging for others to receive the money orders. On other occasions, Thomas has ordered credit cards using other persons' identifying information. Once he obtained a credit card using the personal information of an unwitting inmate whom he had been assisting with legal work. Multiple times, Thomas has approached delivery persons and claimed packages that he knew contained credit cards.

Thomas has been arrested and convicted repeatedly for his crimes of fraud.

During his time in prison, Thomas has devoted his efforts to providing legal assistance to fellow inmates. He has helped thousands of inmates with their legal work. Thomas has testified in three cases, other than this case, and offered affidavits in two additional cases, conveying out-of-court declarations to exculpate the defendants. The first of those instances was at a 1993 trial, the second was a Rule 33 hearing in the fall of 1998, and the remaining instances were in 2001. One of those cases, *United States v. Williams,* involved a motion for a new trial. Judge Raggi concluded that the jury would probably not find Thomas's testimony, about a trial witness's stated intent to commit perjury, to be credible. Furthermore, she found that the witness's declaration to Thomas was too ambiguous to prove that the witness in fact committed perjury.[8]

Based on Thomas's criminal history and efforts on behalf of criminal defendants, a jury would likely conclude that Thomas easily, and convincingly, lies when it suits his purposes and that Thomas has an interest in helping Camacho and Rodriguez overturn their convictions. Thomas's low credibility in general would seriously diminish the impact of his testimony, despite the plausibility of his account of events. On the other hand, as defendants point out, the government's principal witnesses were not paragons of honesty and impartiality themselves. Albizu in particular was a hardened criminal and had a lot to gain by helping the government obtain the convictions of his codefendants. Defendants argue that Thomas and the government's main witnesses would be on relatively equal footing before a jury. The government would ask the jury not to dismiss the testimony of its cooperating witnesses with criminal backgrounds, because only such persons have knowledge of criminal organizations and are willing to give testimony. Similarly, defendants would ask the jury not to dismiss the testimony of Thomas, a convicted criminal who desires to help the defendants, because only such a person would be in a position to gain the confidence of Cherry and be willing to provide testimony. Defendants make the further argument that Thomas, unlike Albizu and Welch, would not derive any direct benefit from his assistance in this case.

Having considered all the circumstances of the case, I conclude that Thomas's testimony as given at the November 19, 2001 hearing is sufficiently credible to permit a jury to hear it at a new trial.

The government does not agree. It argues that "Thomas is not a credible witness and his testimony should be rejected." Post–Hearing Brief at 5. Given Thomas's checkered past, that argument would have considerable force if Thomas's affidavit and subsequent testimony constituted the first mention of Cherry's declarations exculpating Camacho and Rodriguez. But that is not so. Joyce London, Rodriguez's attorney, has submitted an affidavit sworn to on November 5, 1998. London's affidavit describes conversations London had with Cherry at the Metropolitan Correction Center on October 21, 1997, ¶¶ 8–17, and again in September 1998 after Cherry was sentenced, ¶¶ 18–20. During the first conversation, Cherry informed London "that he had personal knowledge of the two people who had shot and killed Hector Ocasio and Gilberto Garcia and who had shot at Luis Garcia and that neither Jaime Rodriguez nor Steven Ca-

---

**8.** The district court's findings are quoted in an unpublished opinion by the Second Circuit. 199 F.3d 1324, 1999 WL 1022491 (2d Cir.1999).

macho had participated in these shootings." London Aff. ¶ 10. During the first conversation between Cherry and London, "[a]lthough Mr. Cherry implied that he himself was one of the shooters, he stopped short of actually admitting it, stating that he did not wish to reveal to me who had performed these acts, until after he had been sentenced in this case." *Id.* ¶ 15. During London's second conversation with Cherry after Cherry's sentencing, Cherry "repeated the same facts with respect to the lack of involvement of both Rodriguez and Camacho in the murders of which they were convicted and again implied that he was one of the shooters." *Id.* ¶ 18. There is no rational basis for dismissing as fabrication Thomas's account of Cherry's exculpatory declarations when we know Cherry made the same declarations to London both before and after his encounter with Thomas.

### C. *The Credibility of Cherry*

 To determine the entitlement of Camacho and Rodriguez to a new trial, I must do more than consider whether a jury would believe Thomas's testimony about what Cherry said to him. I must also consider whether the jury would regard Cherry's declarations as truthful.

In Part II of this opinion, I reviewed the evidence corroborating Cherry's declarations and concluded that the corroboration was sufficient to render them admissible under Rule 804(b)(3) at a new trial. That corroboration also militates in favor of the credibility of Cherry's declarations in the eyes of the jury at a new trial. I need not fully recount that corroborating evidence a second time. But it is worth repeating that Luis Garcia, the only surviving victim of these shootings, testified at trial that the shooters were Williams and Cherry, not Williams and Camacho. It appears that the government persuaded the first

trial jury not to believe Garcia on that point; but it is difficult to imagine a more potent source of corroboration of Cherry's statement that he was the shooter than the agreement of one of the men who was shot. I would only add to this and the prior discussion the fact that Cherry, being in a different prison from Camacho and Thomas at the time, accordingly was not present at the creation, on July 14, 2000, of the affidavit Thomas drafted and gave to Camacho. That circumstance negates the possibility that a creative Thomas placed words in the mouth of a complaisant Cherry.

I conclude that at a new trial, the jury could very well believe Cherry's declarations were truthful. Of course, it is impossible for me (or anyone else) to state with certainty that the jury would accept Cherry's declarations. But the law does not require the impossible; and I think that Cherry's declarations, sufficiently corroborated to be admissible under Rule 804(b)(3) of the Rules of Evidence, are sufficiently credible to support a new trial motion under Rule 33 of the Rules of Criminal Procedure.

### D. *Whether London Could Testify at a New Trial*

In evaluating the likely effect of Thomas's testimony upon the jury at a new trial, it is pertinent to consider whether Joyce London could testify as a defense witness. The briefs of counsel do not address this question and I do not decide it; but a preliminary discussion is appropriate. London is in a position to testify that in October 1997 and September 1998, Cherry made statements to her which closely parallel the statements Thomas says Cherry made to him in June 1998. At a new trial, defendants might seek to call London to testify regarding Cherry's statements ei-

ther in defendants' case in chief or as a rebuttal witness.

Since Cherry's statements to London are hearsay, it is unlikely that defendants would be permitted to call London to testify in their case in chief. Defendants might argue that Cherry's declarations to London are statements against penal interest and thus admissible under Rule 804(b)(3) of the Federal Rules of Evidence. While I do not decide the point at this juncture, characterizing Cherry's declarations to London as statements against his penal interest is problematic. London's affidavit acknowledges that Cherry "stopped short of actually admitting" he was a shooter. London regards that admission as implicit in what Cherry said, but *quaere* whether that is enough to satisfy Rule 804(b)(3).

It is arguable, although I do not decide the issue, that London's testimony would be admissible under the residual exception to the hearsay rule found in Rule 807, whose stated policy is to admit a hearsay statement not specifically covered by the exceptions found in Rules 803 and 804 if "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."

Assuming *arguendo* that the Rules of Evidence would not allow defendants to call London as a witness on their case in chief, the government might open the door to her testimony by suggesting, in argument or cross-examination of Thomas, that (a) Thomas should be disbelieved when he testifies about Cherry's declarations to him, and (b) Cherry's declarations themselves should be disbelieved. In short, the government may challenge the credibility of Thomas, Cherry, or both. The question then arises whether London's testimony concerning Cherry's declarations to her as permissible rehabilitation of the credibility of Thomas, Cherry, or both.

Turning first to the credibility of Cherry, Rule 806 provides that when a hearsay statement has been admitted in evidence (as Cherry's declarations to Thomas would be at a new trial), "the credibility of the declarant may be attacked, *and if attacked may be supported,* by any evidence which would be admissible for those purposes if declarant had testified as a witness" (emphasis added).

Defendants might argue at a new trial that Cherry's statements to London are admissible as prior consistent statements. Rule 801(d)(1)(B) provides an exception to the hearsay rule for prior consistent statements, thus allowing their use not just to rehabilitate a witness's credibility but also as substantive evidence. The Rule states that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. . . .

An argument against admissibility would be that "the prior statement must have been made before the declarant had a motive to fabricate," *United States v. Brennan,* 798 F.2d 581, 587 (2d Cir.1986), and that circumstance may not sufficiently appear.

■ Even if Cherry's prior consistent statement does not satisfy the requirements of Rule 801(d)(1)(B), however, it might still be admissible for the purpose of rehabilitation only. *See Brennan,* 798 F.2d at 587 ("[P]rior consistent statements may be admissible for rehabilitation even if not admissible under Rule 801(d)(1)(B) . . . ."), *citing United States v. Pierre,* 781 F.2d 329, 333 (2d Cir.1986). To be admissible for the purpose of rehabilitation, how-

ever, the prior consistent statement must have "a probative force bearing on credibility beyond merely showing repetition." *Pierre*, 781 F.2d at 333. I do not undertake to resolve, without the benefit of briefing, the question whether Cherry's declarations to London would have sufficient probative force to be offered to rehabilitate Cherry's credibility.

Turning to the credibility of Thomas, the doctrine of prior consistent statements and Rule 801(d)(1)(B) would clearly not apply to Cherry's declaration to London, because that prior statement was made by Cherry, not by Thomas. Nonetheless, it would seem unfair to allow the government to contend before the jury, by argument or cross-examination, that the jury should disbelieve Thomas and find that Cherry never made the asserted declarations to Thomas, while concealing from the jury the fact that Cherry twice made comparable declarations to London. The evidence of Cherry's statements to London is relevant under Rule 401, Fed.R.Evid., because it makes it more probable that Cherry made the same statements to Thomas. Fairness and the "principle of completeness" might allow the defendants to offer London's testimony if the government cross-examined Thomas in such a way as to create the impression that Cherry never made statements exculpating Camacho and Rodriguez to Thomas, the government knowing full well that Cherry had made such statements to London. *See Pierre*, 781 F.2d at 333 (mentioning "principle of completeness" in connection with use of prior consistent statements for rehabilitative purposes); *cf. United States v. Martinez*, 775 F.2d 31, 37 (2d Cir.1985) ("Evidence whose probative value might not be thought to outweigh its prejudicial effect if offered on direct examination may well be admitted during redirect examination for the purpose of rebutting the false impression which resulted from cross examination.") (internal quotation marks and ellipses omitted).

While I make no rulings at this time, I think that the arguable admissibility of London's testimony as a defense witness at a new trial, on one or both of these credibility issues, should be factored into an evaluation of the likely effect of Thomas's testimony upon the jury.[9]

### E. The Effect of Thomas's Testimony at a New Trial

The decisive question on this motion is whether Thomas's testimony, recounting the declaration of Gregory Cherry that Cherry and not Camacho was the shooter, "would probably lead to an acquittal." *Gallego*, 191 F.3d at 161. The Second Circuit's formulation in *Gallego* reflects the reality that no one can foretell with certainty the outcome of a future trial. But I have concluded, for the reasons previously stated, that the jury at a new trial would have ample grounds for believing that Cherry made that statement to Thomas, and that Cherry's statement was true. Those conclusions lead without much difficulty to the conclusion that, in such circumstances, Camacho and Rodriguez would probably be acquitted.

I assume, in the absence of any reason for not doing so, that at a new trial the government would advance the same theory of the Ocasio–Garcia shootings, and that the same witnesses who appeared at the first trial of Camacho and Rodriguez would give the same testimony that they did

---

**9.** I do not require supplemental briefing on the issue of the admissibility of London's testimony, because while significant, it is not a decisive factor. Even if London were not permitted to testify at a new trial, I believe that Thomas's testimony would probably change the verdict at a new trial.

then. But the jury at a new trial, hearing (as the first jury did not) Cherry's admission that he and not Camacho was a shooter, would surely be more likely to credit the testimony of the victim, Luis Garcia, that Cherry, not Camacho, shot him. And if the jury should find that Cherry was a shooter, it would necessarily be skeptical of the accounts given by Albizu and Welch, upon whose testimony, notwithstanding the many discrepancies between them, the convictions of Camacho and Rodriguez must have depended. That likely skepticism would pose problems for the government at a new trial, even though other aspects of the testimony of Albizu and Welch, despite the degree to which they contradicted each other, might be sufficient, if credited by the jury, to brand Camacho and Rodriguez as participants in the Ocasio and Garcia shootings.[10]

The core question is this: Would Cherry's declaration, if believed by the jury at a new trial, probably create a reasonable doubt in the jury's mind with respect to the government's theory of the case against Camacho and Rodriguez? Answering that question in the affirmative, I hold that the motion of Camacho and Rodriguez under Rule 33 must be granted, and a new trial ordered.

It is SO ORDERED.[11]

---

10. The government argued to the jury at the first trial, and reiterates in its briefs on the present motion, that Camacho and Rodriguez called alibi witnesses who were transparently fabricating their testimony. At a new trial the defendants could avoid that pitfall by not trying to establish alibis. I make these observations not for the purpose of indicating any personal belief as to the guilt or innocence of Camacho and Rodriguez–that is not my province–but to assess, as Rule 33 requires me to do, the evidence that would be available (or deletable) at a new trial, and the probable effect of that evidence.

11. I will send a memorandum to the Assignment Committee of the Court requesting that the case be assigned by lot to another Judge for trial. That Judge will direct the timing of the trial. Of course, the government may appeal this order granting a new trial. *See* 18 U.S.C. § 3731.