**UNITED STATES of America**

v.

**Stephen CAMACHO and Jaime Rodriguez, Defendants.**

**No. S–12 94 CR. 313(CSH).**

United States District Court, S.D. New York.

Feb. 2, 2005.

Joshua L. Dratel, Joshua L. Dratel, P.C., Charles Lavine, Marshall Aron Mintz, Mintz & Oppenheim, LLP, Stewart Leigh Orden, Stewart Leigh Order Atty at Law, Michael Sporn, Joyce London, Joyce Clemow London, Law Office of Susan Kellman, New York, NY, for Defendants.

David N. Kelly, U.S. Atty., for S.D.N.Y., New York, NY, Sharon L. McCarthy, Asst. U.S. Atty.; of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This case is before the Court on the government's motion for reconsideration of the Court's prior order granting defendants a new trial. A further evidentiary hearing has been completed and extensive briefs of counsel exchanged. The government's motion is now ripe for decision.

## I. BACKGROUND

In June 1996 defendants Steven Camacho and Jaime Rodriguez were convicted by a jury of various racketeering acts. The principal charges of conviction were conspiracy to murder Hector Ocasio, the murders of Hector Ocasio and Gilberto Garcia, and the attempted murder of Luis Garcia, in aid of a racketeering enterprise and in violation of 18 U.S.C. § 1959.

The Court has had occasion to file numerous opinions in the case, pre-trial, post-trial, and in connection with defendants's subsequent motion for a new trial based on newly discovered evidence, which was granted in an opinion forming the target of the government's present reconsideration motion. While familiarity with all these opinions is assumed, those of particular relevance to the government's motion are reported at 163 F.Supp.2d 287 (S.D.N.Y.2001) ("*Camacho I*") (holding that on defendants' motion for a new trial,

an evidentiary hearing was required to determine whether corroborating circumstances indicated the trustworthiness of an out-of-court declarant's statements inculpating himself and exculpating defendants sufficiently to make the statements admissible at a new trial), and 188 F.Supp.2d 429 (S.D.N.Y.2002) ("*Camacho II* ") (following the evidentiary hearing, holding that declarant's statements would be admissible at a new trial and would probably create a reasonable doubt in the jury's minds as to the guilt of defendants, and granting defendants' motion for a new trial). That is the order the government now asks the Court to reconsider.[1]

Briefly stated, defendants based their motion for a new trial upon purported newly discovered evidence, in the form of an affidavit by Christopher Thomas, a federal prisoner, that described a conversation between Thomas and Gregory Cherry, a fellow inmate and a co-defendant named in the indictment charging defendants, in which Cherry stated that he had committed the crimes for which defendants had been convicted. For reasons that need not be explicated here, Cherry would not be available as a witness at a new trial of defendants. Accordingly the question arose whether under the rules of evidence Thomas could testify at a new trial as to the substance of the declarations Cherry made to him; or, to sharpen the focus of the inquiry, whether Cherry's out-of-court hearsay declarations to Thomas would be admissible. That question implicated Rule 804(b)(3), which provides in pertinent part:

(b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . . . . . . .

(3) **Statement against interest.** A statement which ... at the time of its making ... so far tended to subject the declarant to ... criminal liability, ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible *unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

(emphasis added). I have emphasized the final phrase of Rule 804(b)(3) because Cherry's declarations to Thomas, offered to inculpate Cherry and thus exculpate defendants, is the sort of statement covered by the last sentence of the Rule.

Given that circumstance, in *Camacho I* I identified the first question presented by defendants' motion for a new trial as whether "the declarations Thomas attributes to Cherry [would] be admissible under the rules of evidence at a new trial," adding that "[i]f that question be answered in the negative, then defendants' motion fails of necessity, since this is the only new evidence defendants have to support it." 163 F.Supp.2d at 298. In view of Rule 804(b)(3)'s concluding requirement, I further stated that the admissibility of Cherry's declarations turned upon "whether other evidence provides clear corroboration for the truth of Cherry's statement to Thomas that he committed the murders for which Camacho and Rodriguez were convicted." *Id.* at 309. *Camacho I* concluded with a ruling that "the prudent course is to develop a full record during [an] evidentiary hearing," at which Thomas would testify and "the government may cross-examine Thomas fully as to whether

---

1. The government's motion generated other opinions which are reported at 2002 WL 31770810 (S.D.N.Y. Dec.11, 2002); 2004 WL 235257 (S.D.N.Y. Feb.6, 2004); 2004 WL 829012 (S.D.N.Y. April 15, 2004); and 2004 WL 1367457 (S.D.N.Y. June 16, 2004).

or not in fact Cherry made the statements Thomas ascribes to him," adding that the government "may also offer extrinsic evidence (if it has any) bearing upon that question of fact." *Id.* at 316.

The evidentiary hearing mandated by *Camacho I* consisted of the testimony of Thomas, called as a witness by defendants, who testified on direct examination in response to questions posed by defendants' counsel and was cross-examined by government counsel. Further briefing and submissions of counsel preceded the Court's opinion in *Camacho II,* which granted defendants' motion for a new trial. On the question of the admissibility of Cherry's declarations at a new trial, the government contended that I should evaluate Thomas's credibility, in addition to that of Cherry. I rejected that contention as contrary to Second Circuit authority, citing *United States v. Casamento,* 887 F.2d 1141, 1170 (2d Cir.1989) ("In determining whether such a statement is trustworthy enough to be admissible, ... the court should not look to the credibility of the in-court witness."). *See Camacho II,* 188 F.Supp.2d at 439. In *Camacho II* I identified the "critical question" as "whether there are circumstances clearly corroborating the reliability of Cherry's declaration," and undertook to consider on the record as it then stood whether, first, "there is clear corroboration for Cherry's reliability, evaluating the circumstances of his corroboration," and second, "whether there is clear corroboration for the reliability of the declaration itself, evaluating whether there is other consistent evidence." *Id.* I concluded in *Camacho II* that Cherry's declarations to Thomas were sufficiently corroborated and would be admissible at trial, *see* 188 F.Supp.2d at 439–

444, and that "Cherry's declaration, if believed by the jury at a new trial, [would] probably create a reasonable doubt in the jury's mind with respect to the government's theory of the case against Camacho and Rodriguez." *Id.* at 454. Having reached those conclusions, I granted defendants' motion for a new trial.

The government now moves for reconsideration of that order. Symmetrically, the government bases its motion upon newly discovered evidence, consisting of post-*Camacho II* statements made to the government by Jose Melendez, a federal inmate who for a time was incarcerated together with Gregory Cherry in the Metropolitan Correction Center ("MCC") in Manhattan. Melendez told the office of the United States Attorney for this District that Cherry had told Melendez, in substance, that Cherry had not committed the murders for which Camacho and Rodriguez had been convicted, and that Camacho and Rodriguez, with the assistance of Thomas, an experienced "jailhouse lawyer," had fabricated the account to which Thomas had testified, which described the declarations Cherry made to Thomas upon which defendants had based their successful motion for a new trial.

In that circumstance, the government asked the Court to reopen the evidentiary hearing for the purpose of receiving Melendez's testimony. I granted that application. Melendez testified and was cross-examined by defendants' counsel on May 13, 2004. Another government witness, Les Owen,[2] a Bureau of Prisons staff attorney, testified on May 14 for the purpose of admitting into evidence computer printouts showing where the several inmates involved in the case—Cherry, Camacho,

---

**2.** The government's post-hearing briefs refer to this witness as "Marvin Leslie Owen III." When asked by the deputy court clerk to state his name for the record, the witness eschewed

that resounding appellation and identified himself simply as "Les Owen," Tr. 195, a version that I adopt in this opinion.

Rodriguez, Thomas and Melendez—had been incarcerated at various times. Defendants called no witnesses at the reopened hearing. The evidentiary record was again closed. A further round of briefs of counsel have been submitted. The government's motion for reconsideration of the Court's granting defendants a new trial is now ripe for decision.

## II. DISCUSSION

■ The government's basic contention is that Melendez's testimony, which it characterizes as credible, materially alters the factual circumstances which this Court discerned from the evidentiary record as it existed when *Camacho II* was decided. It follows, the government argues, that (1) Cherry's declarations to Thomas would not be admissible at a new trial because (a) they can no longer be regarded as against Cherry's penal interest, and (b) there is insufficient corroboration of their trustworthiness; and (2) even if Cherry's declarations were admissible, the defendants would again be convicted because (a) the jury would regard Thomas's testimony describing those declarations as unworthy of belief, and (b) Cherry's declarations to Thomas that he, Cherry, committed the murders would be disregarded by the jury as contrary to the weight of the evidence available to the government at trial.

On this last point, the government devotes pages 29–57 of its brief to reviewing the evidence adduced against defendants at the trial which convicted them. There is force to the defendants' view that this aspect of the government's present motion is more accurately characterized as a motion for reargument based on old evidence rather than a motion for reconsideration based on new evidence. But that criticism cannot be made of the other contentions the government makes, which are squarely based upon the testimony of Jose Melendez. It is necessary to consider that testimony in detail.

The Bureau of Prisons records show that between May 10 and October 8, 2002, Melendez and Gregory Cherry were incarcerated together in unit 9 North in the MCC. Owen, Tr. 209. Melendez and Cherry knew each other because they had been incarcerated together at the MCC during certain periods in 1994 and 1995, as well as at the Federal Correctional Institution ("FCI"), Otisville for nine days in 1995. Melendez testified that during those earlier periods, he and Cherry would talk with each other "about basically the street and his—not his case—his activity regarding, you know, what he was arrested for and his being part of the C & C organization." Tr. 46.[3]

In 2002 Melendez was in the MCC awaiting sentencing by Judge McKenna following his plea of guilty in an unrelated case. At that time, as the government accurately states in its main brief at 6, "Melendez was in the midst of contentious litigation against the Government. Melendez had filed numerous affidavits and *pro se* motions contending that the federal prosecutors involved in his case had lied about alleged promises they had made to him concerning, among other things, the availability of a downward departure on his behalf." Cherry was returned to the MCC in May 2002. The opinion in *Camacho II* granting Camacho and Rodriguez a new trial had been filed on March 13, 2002. The government brought Cherry back to the MCC to explore with him, if Cherry would cooperate, the declarations which

---

**3.** The "C & C organization" was a violent gang operating in the Bronx of which Cherry, Camacho and Rodriguez were members. Their participation in that gang's activities resulted in Cherry's conviction on a plea of guilty, and the conviction of Camacho and Rodriguez after trial, which gave rise to their motion for a new trial.

Thomas testified that Cherry had made. Thus the opinion reported at 2004 WL 1367457, at *3, says in this regard:

At some time prior to May 9, 2002, the government was made aware that Cherry may have made declarations to other individuals inconsistent with his statements to Christopher Thomas. Understandably, the government wished to pursue this subject with Cherry. At that time, as he is now, Cherry was in federal custody serving a lengthy sentence. The government arranged to have Cherry moved to the Metropolitan Correctional Center (the "MCC") to facilitate a conversation.

Finding themselves together again at the MCC, Melendez and Cherry conversed. According to Melendez's testimony, Cherry told Melendez about the case involving Camacho (Cherry called him "Camachito"). Responding to questions by the government, Melendez described what Cherry had told him about Cherry's contacts with Christopher Thomas. Melendez testified:

He [Cherry] also talked to me about a guy named Thomas. He said that he met Thomas in Otisville when he was over there fighting his case, the sentencing issues, and that Thomas was helping him with the sentencing issues, and that he was—and he said that's how Thomas came into the picture in Camachito's case. He actually said that Thomas filed some type of affidavit and Camachito could get a new trial. Cherry had told Thomas that he had been the shooter and that Camachito was innocent, something to that effect, and afterwards he was in the law library with his legal papers and trial transcripts, I believe and walked over to where they were at and told Mr. Cherry—told Cherry and said what's up to Cherry and Thomas. He also stated that during that time Camachito proceeded to roll over-pull out trial transcript pages. He actually

said he was helping Camachito with the issues relating to trying to obtain a reversal on the conviction, and they proceeded to review trial transcripts regarding the testimony of some guy named Pito and another guy that had actually gotten shot, that had lived and testified against him.

He also stated that they were going over different scenarios in the law library together and that during that time Mr. Cherry stated to Mr. Thomas that he was trying to get immunity from prosecution, immunity from the court so he can actually take the weight for the shootings, but if he didn't get the immunity that he couldn't do it, because then he would probably be charged with the murder.

Mr. Cherry said that Thomas had told him, had told Camachito to get on his job and contact his lawyer. And I believe Mr. Cherry told him that he had already done that, that he had met with the other defendant's lawyer, Jamie's lawyer. And I think after that, shortly thereafter, I think after that Thomas actually left Otisville.

Q. And this is all information that Mr. Cherry gave to you while you were together in 9 North, correct?

A. Yes, ma'am.

Q. Did the government ask you to talk to Mr. Cherry?

A. No, ma'am.

Q. Did Cherry tell you whether he had actually participated in the murders [of] which Mr. Camacho had been convicted?

A. Yes, he said he did not participate, he said he was not the shooter.

Tr. 50–51. Returning to that last assertion, the government asked Melendez on redirect:

Q. Well, had Mr. Cherry in fact told you that he had nothing to do with the murder Mr. Camacho did?

A. Yes, he did.

Tr. 175.

Melendez further testified in response to the government's questions:

Q. Did Mr. Cherry have a theory on how it was Mr. Thomas came in [sic] to put in an affidavit for Mr. Camacho?

A. Yes, he did.

Q. What was that?

A. He said that Camachito and Thomas had run into each other again in Otisville, and that while they were there Camachito must have gassed Thomas up to prepare an affidavit for him, saying that Cherry had told him he was the shooter when it was not true.

Tr. 61–62.

It occurred to Melendez, whose instinct for self-preservation is manifest, that what he says Cherry told him might be of interest to the government and of benefit to him. While Melendez's recollection of the dates was uncertain when he testified, the government and defendants stipulated at the hearing, Govt. Ex. 6, that on July 9 or July 10, 2002, Ken Haas, an MCC employee, informed AUSA Sharon McCarthy that "a witness" had information about Gregory Cherry. On July 11 or 12, 2002, Haas identified the witness to AUSA McCarthy as Jose Melendez. On July 22, 2002, Melendez met for the first time with AUSA McCarthy and other government personnel. On August 16, 2002, Melendez met for a second time with the government. During those interviews, Melendez gave to the government accounts of what Cherry told him which led to the hearing testimony that I have quoted.

At the second interview on August 16, Melendez gave AUSA McCarthy handwritten notes, Govt. Ex. 3501A, describing his conversations with Cherry which he testified he prepared "shortly after" he met with AUSA McCarthy the first time. Tr. 180. On November 20, 2002, Melendez wrote a letter to Lloyd Epstein, his attorney, enclosing additional handwritten notes, dated September 15 and 25, 2002, and asking that they be forwarded to the government. These notes are Govt. Ex. 3501B. Melendez testified that he prepared them after talking with Cherry on the indicated dates in September. They were among his property left behind at the MCC when Melendez was transferred elsewhere, and did not catch up with him until November. Tr. 182–83.

As defendants' counsel brought out in cross-examination, the notes do not contain all the statements by Cherry which Melendez described in his testimony, but they are consistent with that testimony in that they both quote Cherry as denying that he participated in the shootings for which defendants were convicted. See, e.g., Govt. Ex. 3501B, at page 3:

G. [Cherry] stated that if Joyce London or the prosecutor was to call him to testify by subpoena that he was going to fuck the prosecutor, and give enough doubt as to Camachito and Jaime's guilt, that they would either get acquitted at a retrial or that judge Haight will grant their new trial without reconsidering his ruling of giving them a new trial. . . . He stated that he didn't have anything to lose, especially since he didn't have anything to do with the murders Camachito and Jaime participated in, and the government not being able to charge him with shit.

The notes' description of how Cherry intended to discomfit the government is consistent with what Melendez testified Cherry told him about what he would do if the government, having arranged Cherry's return to the MCC in 2002, called him to testify in the instant case:

Q. Now, did Mr. Cherry ever tell you what he would do if he were in fact called to testify about Camacho's case?

A. Yes, ma'am. He said that if the government subpoenas him without him having a deal to testify, that he would take the stand and make implications like he was somehow the shooter to screw the government's case up. And when the government tried to prosecute him for the crimes, that he had a big surprise for them, to prove that he wasn't the shooter.

Tr. 56.

Based principally upon Melendez's testimony, the government offers the following scenario of events. Gregory Cherry dislikes prosecutors. Cherry, Camacho and Rodriguez are, so to speak, comrades in arms. Cherry was quite prepared, even eager, to "fuck the prosecutor" and obtain a new trial for Camacho and Rodriguez if he could do so without prejudice to himself. He first attempted to do so by twice contacting Rodriguez's attorney, Joyce London. On the basis of the record then before me, I described those contacts in *Camacho I,* 163 F.Supp.2d at 291:

> In April of 1999, defendants filed a second motion for a new trial based on newly discovered evidence.... Defendants requested a grant of judicial immunity so that a proposed witness, Gregory Cherry, could testify that he committed the crimes for which defendants were convicted. Counsel for Rodriguez had met with Cherry in the fall of 1997 and the fall of 1998 and stated in an affidavit that Cherry told her that he knew who was responsible for the murders and that Camacho and Rodriguez were not involved. Cherry told her that he would testify only if he was granted immunity.

Melendez testified that Cherry told him this about his meetings with Ms. London:

Q. [by AUSA McCarthy]: Did Mr. Cherry tell you directly that he had in fact met with one of the defendant's lawyers back in November of 1997? Do you recall making a note of that in the initial notes, 3501A?

A. I remember he did tell me that he had met with Jamie's lawyer, but I can't tell you the exact date, because I don't recall.

Q. All right. And can you tell us, if you recall, the substance of what it was that Mr. Cherry told you about that meeting with Jamie's lawyer?

A. Yes. He said that he met with her with the intentions of trying to see if she could get immunity for him from the court, and so he can testify on behalf of Camachito in reference to the shootings that occurred, and that at that meeting he kind of spinned her around to make it seem like—made implications like he was the actual shooter and stuff, but that he didn't want to tell her outright that he had actually done these shootings, because then if he didn't get the immunity, they would try to charge him with the murders themselves, which was exactly what they were doing now, accusing him of.

Q. Did Mr. Cherry in essence tell you that he had played head games with Jamie's lawyer?

A. Yes, he did.

Tr. 60–61.

On December 1, 1999, I declined to grant Cherry judicial immunity and denied defendants' motion for a new trial. 1999 WL 1084229 (S.D.N.Y. Dec.1, 1999). The government's theory of the case is that Cherry's quest for immunity having failed, thereby depriving defendants of Cherry's direct testimony that he was the Ocasio/Garcia shooter, Camacho and Thomas in a subsequent discussion agreed to get Cherry's statement before the Court indi-

rectly, by the vehicle of an affidavit by Thomas that Cherry had made those declarations to him. And it was Thomas's affidavit to that effect that led to the evidentiary hearing which resulted in the Court's order granting defendants a new trial.

The government's scenario depends upon the credibility of Melendez, which counsel for defendants vigorously attacked in their cross-examinations and post-hearing briefs. Defendants's briefs argue principally that while he was in the MCC in 2002, possibly after Cherry was transferred there, Melendez conducted legal research, found this Court's opinion in *Camacho II* granting defendants a new trial, read it and realized that Cherry's declarations to Thomas as described by Thomas were the cornerstones of that opinion, realized further that discrediting those declarations would benefit the government, and therefore, in hopes of benefitting himself, Melendez fabricated the statements he ascribed to Cherry during his conversations with Cherry at the MCC, contacted AUSA McCarthy through Haas, described those fabricated statements by Cherry to the prosecutors during his two meetings with them, also made the statements up in his handwritten notes, and testified falsely during the reopened evidentiary hearing that Cherry had told him that he was not the Ocasio/Garcia shooter and that any prior contrary declarations, to Ms. London or to Thomas, were part of a scheme to prejudice the government, deceive the Court, and obtain a new trial for defendants.

The credibility of Melendez is thus placed squarely at issue. In my view, if as a general proposition the credibility of Melendez and Cherry were rated on a scale of 1 to 10, with 1 meaning nothing someone says can be believed and 10 meaning everything someone says should be believed, both would be hovering around 2.[4]

Cherry is a violent felon, openly disposed against prosecutors, who has given different accounts to different law enforcement agents at different times, and never implicated himself in the Ocasio/Garcia shootings on prior occasions when he was purportedly giving a full account of his conduct.

As for Melendez, he got in touch with the government through Haas of the MCC, told the AUSA in charge of this case about Cherry's statements to him, made his notes of those conversations, and gave them to the prosecutor, all in the hope that it would benefit him in his sentencing in the case before Judge McKenna or otherwise, as he acknowledged at the hearing. AUSA McCarthy says in the government's main brief at 55 that "Melendez's testimony at the hearing was entirely credible." That might come as something of a surprise to former Special Assistant United States Attorney Steven M. Cohen, who was the prosecutor in the case before Judge McKenna. Responding to Melendez's claim that the government had wrongfully denied him favorable treatment, Cohen wrote to Judge McKenna that Melendez's repeatedly mendacious conduct "amply demonstrates why the Government refused to enter into a cooperation agreement with him, refused to call him as a trial witness and *refused to place itself in the untenable position of presenting him to a jury as a credible witness.*"

---

4. This opinion does not evaluate the credibility of Thomas. The question before the Court remains the admissibility of Cherry's purported declarations to Thomas. As noted in text *supra*, I held in *Camacho I* that in determining whether Cherry's declarations were trustworthy enough to be admissible, "the court should not look to the credibility of the in-court witness," citing and quoting *United States v. Casamento*, 887 F.2d 1141, 1170 (2d Cir.1989).

Letter dated October 8, 1998 from SAUSA Cohn to Judge McKenna at 4 (Ex. 1 to brief for defendant Camacho) (emphasis added).[5]

A fact finder required to assess the credibility of a witness has certain sources of assistance, including the witness's demeanor, the plausibility or implausibility of the witness's statements, and the presence (or absence) of independent corroborating evidence. In the case at bar, there was nothing in Melendez's demeanor that either proclaimed him to be a be truth teller or branded him as a liar. Perhaps that is not surprising; he is experienced in the ways of the witness stand. But other factors militate in favor of the credibility of Melendez's testimony.

First, the government's scenario is inherently plausible. The attitudes, predilections, and desires of Cherry, Thomas, Camacho and Rodriguez converge in a way that makes perfect sense of the government's theory of the case. Cherry disliked law enforcement and prosecutors and would welcome an opportunity to confound them, if he could do so without cost to himself. Thomas proclaimed his experience in giving inmates quasi-legal advice, and had developed a *modus operandi* in providing inmates seeking new trials with affidavits or testimony whose substance closely resembles that of the declarations at issue in this case. Camacho and Rodriguez had an obvious desire to obtain a new trial.

Second, the government's scenario is supported by the dates and locations of the incarcerations of Cherry, Thomas, Camacho and Rodriguez, as testified to by Owen and documented by the Bureau's records. I will set forth the most pertinent data.

Camacho and Cherry were housed together at the MCC between January 27, 1997 and April 22, 1997. They were then together at Otisville between July 9, 1997 and July 29, 1997. These overlaps would allow Camacho and Cherry to discuss and agree upon Cherry's initial approach to Ms. London, which occurred in the fall of 1997.[6] This is so, whether or not they were housed in the same unit. Inmates at Otisville from different housing units were allowed to mingle in the yard, a large compound, during the evenings, and could also come together in the law library. Owen, Tr. 205–06.

Camacho, Rodriguez, Cherry and Thomas were all housed at Otisville between April 3, 1998 and June 9, 1998. These overlaps would allow some or all of the four to discuss and agree upon Cherry's

---

**5.** Defendants' briefs understandably dwell at length upon the government's earlier condemnations of Melendez's credibility in the case before Judge McKenna. The government responds by remarking that "if prior determinations of untrustworthiness were the test, defendants would never have proffered Christopher Thomas, a jailhouse lawyer whose testimony had previously been rejected by at least one District Court Judge." Reply brief at 1. This is an example of the familiar *et tu quoque* gambit (translated from Latin into vernacular English: "Yeah, and you're another"). A lesson to be drawn from these exchanges is that the exigencies of litigation may require advocates to walk first on one side of the street, then on the other. This

particular response by the government is not enlightening. As stated in text, I will apply external tests of credibility particular to this case in evaluating the credibility of the individuals involved in it.

**6.** It is not surprising that Cherry approached Ms. London, who was Rodriguez's attorney, rather than Camacho's. Camacho and Rodriguez gave every indication of being friendly with each other. Ms. London and Camacho's trial attorney cooperated closely with each other during the presentation of what was essentially a joint defense. Ms. London continues to represent Rodriguez, while Camacho has dismissed his trial counsel.

second approach to Ms. London, which occurred in the fall of 1998.

The Court's decision refusing to compel the government to grant immunity to Cherry (the condition precedent to the testimony Cherry dangled before Ms. London) was dated December 1, 1999. Counsel for Camacho and Rodriguez undoubtedly informed their clients of that ruling. Camacho and Thomas were lodged in the same housing unit at Otisville between July 6, 2000 and July 18, 2000. That overlap would allow Camacho to tell Thomas about defendants' failure to place Cherry's exculpatory testimony before the Court directly, through the medium of a grant of immunity, and also allow Thomas to suggest to Camacho that (consistent with Thomas's *modus operandi)* the same declarations could be presented to the Court indirectly, through the medium of an affidavit and subsequent testimony by Thomas stating that Cherry had made those statements to him. Strikingly, Thomas's affidavit was dated July 14, 2000, midway through the period of time that Camacho and Thomas were occupying the same housing unit at Otisville.

The close correlations between these overlapping incarcerations of the individuals involved and significant external events in the case considerably strengthen the likelihood of the government's scenario, and with it the credibility of Melendez's testimony.

Third, the record contains direct corroboration of Melendez's testimony. To begin with, Melendez recounted to the government what Cherry purportedly told him about Cherry's contacts with Joyce London. I quoted Melendez's testimony on that point *supra.* The question arises: how did Melendez know that Cherry had spoken with Ms. London if Cherry had not told him? To be sure, I described Cherry's contacts with Ms. London in three opinions: the December 1, 1999 opinion,

reported only in Westlaw, rejecting defendants's motion to immunize Cherry; *Camacho I,* 163 F.Supp.2d at 309, decided on October 1, 2001, directing that an evidentiary hearing be held on defendants' motion for a new trial; and *Camacho II,* 188 F.Supp.2d at 450–51, decided on March 13, 2002, granting the new trial motion. But Melendez testified that he had never read any of the Court's opinions in the case. Tr. 91.

That testimony is significant, because as noted *supra* the defendants' theory of the case assumes that Melendez read, marked, learned, and inwardly digested the Court's opinion in *Camacho II,* which inspired him to fabricate the statements by Cherry that Melendez recounted to the government.

Defendants offer no evidence in support of that theory. It is speculation, contrary to the only evidence in the record, and inherently implausible, given the library facilities that existed at the MCC at the time. Owen testified, and I accept, that no prison (including MCC) allows inmates unfettered access to the Internet, Tr. 217, so an opinion reported only in Westlaw would not have been available to Melendez. The law library at the MCC, which still collects those old-fashioned artifacts called "books," keeps the West federal reports current. Those reports up to 1996 are also kept on a CD–ROM, which the MCC staff used for awhile in an effort to avoid damage to the bound volumes, but "we didn't continue to upgrade or update that system, because we just found it wasn't cost efficient to do so." Owen, Tr. 218. All inmates have access to the library, in one way or another; but inmates confined in a special housing unit, as Melendez was at the pertinent time, Tr. 90, in lockdown 23 hours a day, would have to use a contained "satellite" library in the unit and request that particular volumes be brought to them. Owen, Tr. 222. In addition, de-

fense attorneys can send hard copies of opinions to their incarcerated clients

What all this comes down to is that while Melendez was in the MCC he could have read the opinion in *Camacho II*, there is no evidence that he did so, his access to the law library was limited, he was busily pursuing his own agenda in Judge McKenna's case, and he denied having read any of the opinions in this case. I am not persuaded by defendants' speculation to the contrary.

Accordingly, I accept Melendez's testimony that he has never read any of my opinions in this case. That finding leads inescapably to the conclusion that Melendez knew about Cherry's approaches to Ms. London because Cherry told him about them.

In a similar vein, Melendez recounted to the government what Cherry had said to him about Cherry's dissatisfaction with the attorney then representing him in connection with Cherry's own recent discussions with the prosecutors, and gave his reasons. Tr. 49–50. It is crystal clear that the attorney in question was Maurice Sercarz, Esq., who Judge Stein [7] eventually replaced as Cherry's attorney. The relevant facts and circumstances are set out in my opinion dated found in 2004 WL 235257, at *6–*7 (S.D.N.Y. Feb.6, 2004). The government says without contradiction that this was the first publicly available description of these facts and circumstances, so that, again, Melendez could have known of them in 2002 only because Cherry told him.

Counsel for defendants cast a suspicious eye upon Melendez's two sets of handwritten notes describing what Cherry told him. Melendez eventually acknowledged in his testimony that he did not write up the first set of notes until after his first discussion with the prosecutors. He gave those first notes to the prosecutors at his second and last meeting with them. Defendants argue that the notes cannot be credited because Melendez simply wrote down what he had learned the government wanted to hear. However, the record makes it clear that during his first meeting with prosecutors on July 22, 2002, Melendez gave an oral description of what Cherry had said to him which was the same in substance as that contained in the notes Melendez gave to the prosecutors during the second meeting on August 16, 2002. We know this because AUSA McCarthy set forth the substance of Cherry's statements to Melendez in an affidavit filed with the Second Circuit and dated *July 26, 2002*. In preparing that affidavit, AUSA McCarthy could have been relying only upon what Melendez told her on July 22; she did not receive Melendez's first set of notes until August 16.

To sum up this aspect of the case: while Melendez had an obvious motive to lie to the government about Cherry's statements to him at the MCC in 2002, and his reputation for credibility was deplorable, there is significant evidence in the record which supports and corroborates Melendez's testimony about what Cherry said to him.

What effect does Melendez's testimony, if I accept it, have upon the entitlement of the defendants to a new trial? I begin that analysis with a consideration of the relevant burden of proof.

■ The defendants are the proponents of Cherry's purported declarations to Thomas. Therefore they bear the burden of demonstrating the admissibility of the declarations. This general principle applies to all questions of admissibility that arise under the Federal Rules of Evidence. The Supreme Court made that clear in *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987),

---

**7.** District Judge Stein is the successor trial judge in this case.

which dealt with Rule 104(a). That rule provides: "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court." The Court observed that while preliminary questions of fact determinative of admissibility "must be resolved by the [trial] court," the Federal Rules of Evidence "nowhere define the standard of proof the court must observe in resolving these questions." 483 U.S. at 175, 107 S.Ct. 2775. The Court then said:

> We are therefore guided by our prior decisions regarding admissibility determinations that hinge on preliminary factual questions. We have traditionally required that these matters be established by *a preponderance of proof.* Evidence is placed before the jury when it satisfies the technical requirements of the evidentiary Rules, which embody certain legal and policy determinations. The inquiry made by a court is not whether *the proponent of the evidence* wins or loses the case on the merits, but whether the evidentiary Rules have been satisfied.

*Id.* (emphasis added).

In the case at bar, Rule 804(b)(3) is the evidentiary rule whose "technical requirements" must be "satisfied" and defendants as proponents of the evidence bear the burden of doing so, as the Second Circuit has made plain in cases the rule governs. *See, e.g., United States v. Doyle,* 130 F.3d 523, 543–544 (2d Cir.1997) ("The burden is on the accused to justify admission of the statements by demonstrating that the statements are sufficiently corroborated."); *United States v. Salvador,* 820 F.2d 558,

561 (2d Cir.1987) ("[T]he burden is put upon the accused to justify admission of the exculpatory statement by showing 'corroborating circumstances' that indicate 'the trustworthiness' of the statement.").[8]

The record having been reopened and Melendez's testimony received, it becomes entirely clear that the defendants, as proponents of the admissibility of Cherry's asserted declarations to Thomas, can carry their burden of proof as to admissibility of those declarations only if I conclude that I must reject the Melendez testimony and accompanying handwritten notes as entirely as unworthy of belief. That is so for the following reasons.

The key declarations by Cherry to Thomas that defendants would offer for admission at a new trial were purportedly made during the period in 1998 when Camacho, Cherry and Thomas were all housed at Otisville. Those declarations are summarized in *Camacho II,* 188 F.Supp.2d at 441:

> According to Thomas, one day when Thomas was working in the library with Cherry, Camacho walked in. Thomas noticed that Camacho looked in their direction and did not greet them, and Thomas assumed that Camacho didn't recognize him. Thomas remarked to Cherry that he knew Camacho. Cherry responded that *Camacho was his co-defendant and was there for something that Cherry did.* When Thomas asked Cherry what he meant, Cherry said 'bodies.' Cherry also mentioned that he had told an attorney that *Camacho and*

---

**8.** In *Salvador* the Second Circuit went on to say: "Second, corroboration must 'clearly' indicate such trustworthiness. We take this to mean that the inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable." 820 F.2d at 561. This language could be read as imposing a more stringent stan-

dard for the admission of an exculpatory hearsay declaration in a criminal case under Rule 804(b)(3) than the "preponderance of proof" standard generally proscribed by the Supreme Court *Bourjaily.* But I need not be concerned with any possible tension between these cases because the result I reach is the same under either standard.

*another person were innocent of the charges against them.*

(emphasis added). Given the totality of the circumstances, these asserted declarations can only be referring to the Ocasio/Garcia murders. Cherry and Camacho (together with Rodriguez) were co-defendants in the C & C case, and the charges against Camacho and Rodriguez, upon which they were convicted, centered upon the Ocasio/Garcia murders.

As the proponents of these declarations by Cherry to Thomas at a new trial, in order to satisfy the requirements of Rule 804(b)(3) defendants would have to establish by a preponderance of proof each of these elements: (1) Cherry actually made these statements to Thomas; (2) the statements should be regarded as against Cherry's penal interest; and (3) "corroborating circumstances clearly indicate the trustworthiness of the statement[s]." In *Camacho I* I concluded that defendants had satisfied these requirements, but the record has now been expanded to include the testimony of Melendez and his handwritten notes, and the effect of that evidence, if I do not reject it, must be assessed.

As for the first element: Melendez did not testify that Cherry told him he had never made the declarations in question to Thomas. What Melendez testified was that Cherry "actually said that Thomas had filed some sort of affidavit and Camachito would get a new trial. Cherry had told Thomas that he had been the shooter and that Camachito was innocent, something to that effect ..." Tr. 50.

However, the circumstances of that statement by Cherry to Thomas, as described by Cherry to Melendez, taken together with Cherry's other statements to Melendez quoted *supra*, cast grave doubt upon the second prerequisite of the admissibility of Cherry's declarations to Thomas as described by Thomas: that they be against Cherry's penal interest. The pic-

ture that emerges from Melendez's testimony about what Cherry told him at the MCC in 2002 is one of Cherry stating or intimating that he was the Ocasio/Garcia murderer not as an individual making a credible statement against his own penal interest, but rather as playing a leading role in a fictitious drama designed to free Camacho and Rodriguez and dismay the government (which, given Cherry's world view, would constitute a gratifying killing of two birds with one stone).

Moreover, if Melendez's testimony is accepted by the Court, the totality of circumstances revealed by the record makes it impossible for the defendants to bear their burden of proving, either by the preponderance standard articulated by the Supreme Court in *Bourjaily* or the arguably more stringent standard the Second Circuit suggested in *Salvador*, the existence of "corroborating circumstances" that "clearly indicate the trustworthiness" of Cherry's declarations to Thomas as testified to by Thomas. Unless Melendez's testimony is rejected as unworthy of belief, the indications in the expanded record point to the untrustworthiness of those declarations, rather than to their trustworthiness.

Having considered the record carefully, I conclude that I am not able to dismiss Melendez's testimony as unworthy of belief. I have reviewed the several circumstances which support or corroborate Melendez's account of what Cherry said to him. The combined effect of those circumstances leads me to the conclusion that Melendez testified truthfully.

It follows that, for the reasons stated, Thomas could not testify at a new trial about Cherry's purported declarations to him because those declarations are not admissible under Rule 804(b)(3). This is fatal to the defendants' motion for a new

trial, because it depended entirely upon the admissibility of those declarations.[9]

The government's motion for reconsideration is granted. The Court's prior order granting defendants a new trial is vacated. Their motion for a new trial is denied.

It is SO ORDERED.

9. This view I take of the case makes it unnecessary for me to consider the government's alternative ground for reconsideration, namely, that the evidence available to the government, including that bearing upon Thomas's credibility as a witness, would result in the defendants being convicted again at a new trial even if Thomas were permitted to testify about what Cherry purportedly said to him.