**UNITED STATES of America,**

v.

**Steven CAMACHO and Jamie Rodriguez, Defendants.**

**No. 94 Cr. 313(CSH).**

United States District Court, S.D. New York.

Nov. 12, 2008.

Michael J. Garcia United States Attorney by Elizabeth F. Maringer, Assistant U.S. Attorney, New York City, for Plaintiff.

Joyce Clemow London, Law office of Joyce C. London, Joshua Lewis Dratel, Law Offices of Joshua L. Dratel, P.C., New York City, for Defendants.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Defendants Steven Camacho and Jaime Rodriguez renew their motion for a new

trial pursuant to Rule 33, Fed. R. Cr. P. More specifically defendants, relying upon "the newly obtained affidavit" of an individual named William Morales, move for "an Order (a) granting Defendants' motion for re-consideration of the Court's reversal of its former grant of a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure; (b) vacating its decision and order reversing its prior grant of a new trial and reinstate its prior decision and order granting Defendants a new trial; or in the alternative (c) re-opening the evidentiary hearing to permit Defendants to present this newly obtained evidence." Notice of Motion dated April 7, 2007 at 1. The government opposes the motion.

## I. BACKGROUND

In June 1996 Camacho and Rodriguez were convicted by a jury of various racketeering acts. The principal charges of conviction were conspiracy to murder Hector Ocasio, the murders of Hector Ocasio and Gilbert Garcia, and the attempted murder of Louis Garcia, in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959.

As the quoted preamble to defendants' present motion reflects, the case has generated a number of prior opinions. The principal decisions of this Court are reported at 163 F.Supp.2d 287 (S.D.N.Y. 2001) (*Camacho I*) (holding that Court had jurisdiction over defendants' Rule 33 motion for a new trial and directing that an evidentiary hearing be held); 188 F.Supp.2d 429 (S.D.N.Y.2002) (*Camacho II*) (granting defendants' motion for a new trial); and 353 F.Supp.2d 524 (S.D.N.Y. 2005) (*Camacho III*) (granting government's motion for reconsideration and denying defendants' motion for a new trial). In an opinion reported at 187 Fed.Appx. 30, 2006 WL 1675382 (2d Cir. June 12, 2006) (*Camacho IV*), the Second Circuit affirmed this Court's order in *Camacho III* denying defendants' motion for a new trial and affirmed their convictions. Familiari-ty is assumed with these opinions and all other opinions and orders of this Court during the course of the case.

The salient facts leading up to defendants' present motion may be recounted briefly. Defendants' motion for a new trial was based upon newly discovered evidence, namely an affidavit by Christopher Thomas, a federal prisoner, that described a conversation between Thomas and Gregory Cherry, a fellow-inmate and a co-defendant named in the indictment charging defendants, in which Cherry stated that he had committed the crimes for which defendants had been convicted. Since Cherry would not be available as a witness at a new trial of the defendants, their Rule 33 motion turned upon whether Thomas could testify as to the declarations Thomas said Cherry had made to him. That question implicated Rule 804(b)(3) of the Federal Rules of Evidence, which required defendants, as proponents of Thomas's in-court testimony, to show that Cherry's out-of-court hearsay declarations would be admissible. Rule 804(b)(3) provides in part: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." In other words, the decisive consideration under Rule 804(b)(3) is the trustworthiness of Cherry's asserted statements to Thomas, not the trustworthiness of Thomas's description of them. *See Camacho IV*, 187 Fed.Appx. at 35 ("[T]he district court did not err in finding that the defendants failed to meet their burden of showing that corroborating circumstances clearly indicate the trustworthiness of Cherry's statement, Fed.R.Evid. 804(b)(3), as required to render Cherry's statement admissible and win their new-trial motion.") (internal quotation marks, brackets, and footnote omitted).

After an evidentiary hearing at which Thomas described his conversations with Cherry, I held in *Camacho II* that Cherry's declaration was sufficiently corroborated by other evidence in the record to be admissible under Rule 804(b)(3), and that defendants were entitled to a new trial because "Cherry's declaration, if believed by the jury at a new trial, [would] probably create a reasonable doubt in the jury's mind with respect to the government's theory of the case against Camacho and Rodriguez." 188 F.Supp.2d at 454.

The government then moved for reconsideration of *Camacho II*, also relying upon newly discovered evidence, in the form of statements by Jose Melendez, a federal inmate who for a time was incarcerated with Cherry in the Metropolitan Correction Center ("MCC") in Manhattan. A time came when Melendez contacted the office of the United States Attorney for this District. He told the prosecutors that Cherry had told him, in substance, that Cherry had not committed the murders for which Camacho and Rodriguez had been convicted; and that Camacho and Rodriguez, with the help of Thomas, an experienced "jailhouse lawyer," had fabricated the account to which Thomas testified and upon which defendants based their successful motion for a new trial.

At the government's request, I reopened the evidentiary hearing so Melendez could testify. The hearing took place on May 13, 2004. On direct examination by the government, after preliminary background questions Melendez testified as follows:

Q. And can you tell us what it is that you talked about and what [Cherry] told you?

A. When I was with him at the MCC, Mr. Cherry told me that he had been called back possibly to testify in the Camachito [Camacho] case. He told me that his lawyer believed that the lawyer they gave him was trying to set him up

because he had been interviewed by the lawyer and the lawyer gave the lawyer some information which the lawyer took back to the government and told the government what he had told the lawyer. He said he didn't trust the lawyer. The lawyer in the past did not put in certain issues he wanted put in a motion to withdraw his plea. He also said that his lawyer had an assistant file a motion to the court without letting him review it beforehand, and that the assistant—that he called the assistant up and told the assistant, for her to tell the lawyer to remove himself from the case, that if he didn't remove himself from the case he was not going to be responsible for his actions the next time he saw him.

Tr. 49–50. Melendez's testimony then turned to his assertion that Thomas and Cherry had fabricated Cherry's declaration to Thomas that he committed the crimes for which defendants had been convicted. That testimony is quoted in *Camacho III*, 353 F.Supp.2d at 529–530. With respect to Cherry's difficulties with his lawyer, Melendez further testified on direct examination:

Q. Did there come a time when Mr. Cherry went to court on his case?

A. Yes, he did.

Q. And did he speak to you afterwards?

A. Yes, he did.

Q. What did he tell you?

A. He told me that while he was in court that the judge was trying to gas him, which means like make him keep the attorney that was presently representing him, but that he refused and continued to fight for the lawyer to be removed, and that ultimately the judge took the lawyer off the case and gave him a new lawyer.

Tr. 52–53. The lawyer in question is undoubtedly Maurice Sercarz and the judge

is undoubtedly Judge Stein. The hearing in question took place on August 12, 2002. The circumstances leading up to Judge Stein's replacing Mr. Sercarz as Cherry's attorney are fully described in an opinion reported at 2004 WL 235257 (S.D.N.Y.Feb.2, 2004).

Defendants vigorously cross-examined Melendez and argued in theirpost-hearing briefs that "while [Melendez] was in the MCC in 2002, possibly after Cherry was transferred there, Melendez conducted legal research, found this Court's opinion in *Camacho II* granting defendants a new trial, read it and realized that Cherry's declarations to Thomas as described by Thomas were the cornerstones of that opinion, realized further that discrediting those declarations would benefit the government, and therefore, in hopes of benefiting himself, Melendez fabricated the statements he ascribed to Cherry during his conversations with Cherry at the MCC," contacted the government, and repeated those fabrications to the prosecutors, *Camacho III*, 353 F.Supp.2d at 532.

In *Camacho III*, I rejected defendants' scenario, finding in the record a number of factors which supported or corroborated Melendez's account of what Cherry said to him. Accepting Melendez's testimony as truthful, I concluded that "the totality of circumstances revealed by the record makes it impossible for the defendants to bear their burden of proving ... the existence of 'corroborating circumstances' that 'clearly indicate the trustworthiness' of Cherry's declarations to Thomas as testified to by Thomas." 353 F.Supp.2d at 537. It followed that Cherry's declarations were inadmissible under Rule 804(b)(3), a conclusion "fatal to the defendants' motion for a new trial, because it depended entirely upon the admissibility of those declarations." *Id.* at 537–38 (footnote omitted). *Camacho III* granted the government's motion for reconsideration, vacated the prior order granting defendants a new tri-

al, and denied their motion for that relief. In *Camacho IV* the Second Circuit affirmed *Camacho III*.

In *Camacho III*, I listed four evidentiary sources in the record which tended to corroborate Melendez's testimony about what Cherry said to him in the MCC. I will recount them again.

*First*, the government's scenario, based upon Melendez's testimony, "is inherently plausible," since "[t]he attitudes, predilections, and desires of Cherry, Thomas, Camacho and Rodriguez converge in a way that makes perfect sense of the government's theory of the case." 353 F.Supp.2d at 533. In that regard, I took note of the fact that "Cherry disliked law enforcement and prosecutors and would welcome an opportunity to confound them, if he could do so without cost to himself." *Id.* That assessment was based in part upon the Court's observations of Cherry during pretrial proceedings, Cherry's allocution on his eventual guilty plea, and his subsequent unsuccessful motion to withdraw that plea. Cherry is angry and vindictive. To concoct a false story to help Camacho and Rodriguez gain a new trial by fooling the Court, as Melendez testified Cherry told him, would come as naturally to Gregory Cherry as breathing.

*Second*, the government's scenario "is supported by the dates and locations of the incarcerations of Cherry, Thomas, Camacho and Rodriguez." 353 F.Supp.2d at 533. After reciting the numerous details, I said that "[t]he close correlation between these overlapping incarcerations of the individuals involved and significant external events in the case considerably strengthen the likelihood of the government's scenario, and with it the credibility of Melendez's testimony." *Id.* at 534.

*Third*, I accepted Melendez's testimony that "he has never read any of my opinions in this case," because "there is no evidence

that he did so, his access to the [MCC] law library was limited," and "he was busily preparing his own agenda in Judge McKenna's case...." 353 F.Supp.2d at 535. That was material because the defendants' theory was and remains that Melendez fabricated his conversations with Cherry. In *Camacho III*, I noted that "[t]o begin with, Melendez recounted to the government what Cherry purportedly told him about Cherry's contacts with Joyce London [counsel for defendant Rodriguez]," and I posed the question: "how did Melendez know that Cherry had spoken with Ms. London if Cherry had not told him?" *Id.* at 534. Defendants' answer was that Cherry's contacts with Ms. London were described in the Court's three prior opinions, from which defendants assumed that "Melendez read, marked, learned and inwardly digested the Court's opinion in *Camacho II*, which inspired him to fabricate the statements by Cherry that Melendez recounted to the government." *Id.*

*Fourth*, Melendez also recounted to the government "what Cherry had said to him about Cherry's dissatisfaction with the attorney then representing him in connection with Cherry's own recent discussions with the prosecutors, and gave his reasons." 353 F.Supp.2d at 535. This was the previously recounted episode involving Mr. Sercarz and Judge Stein. Unlike Cherry's contacts with Ms. London, Melendez could not have learned about those events from reading my prior opinions in the law library, because I did not discuss them until the 2004 opinion reported at 2004 WL 235257. This prompted me to say in *Camacho III*: "The government says without contradiction that this was the first publicly available description of these facts and circumstances, so that, again, Melendez could have known of them in 2002 only because Cherry told him." *Id.*

Defendants' present motion for reconsideration focuses solely upon the third of these three sources of corroboration of Melendez's account, specifically, evidence of Melendez's limited access to the MCC law library, a factor consistent with his testimony that he had not read the Court's opinions in the underlying case. Defendants now challenge both propositions. They assert that Melendez frequently made use of the law library, read opinions in this case, and discussed them with other inmates. For these contentions defendants rely upon the statements of yet another federal inmate: William Morales. On December 13, 2006, Morales swore to an affidavit which recites that following his arrest in 2002 on drug and gun charges, he was housed in Unit 9 North of the MCC. Morales's affidavit then gives this account:

> In the spring of 2002, I met an individual named Jose Melendez who was also known by the name "Epic." He was also housed on Unit 9 North. Epic was an inmate who frequented the law library. While on this unit, I observed Epic with legal opinions.
>
> One of the opinions in particular stands out in my mind as Epic came back from the law library with an opinion in his hand and told people on the floor about it. It was an opinion that involved a defendant named Gregory Cherry and a witness who claimed that Cherry had told him (the witness) that Cherry had committed a murder that someone else had been charged with, Because I knew of Cherry from the street, Epic got my attention when he stared talking about this case. I was also interested in this opinion because it resulted in a new trial for the defendants.
>
> Epic gave me this opinion to read. I also observed him give the opinion to at least two other inmates also housed on 9

North. These inmates were Hector Vega and Roy Castro.

Some time after I saw Epic with the opinion, inmate Gregory Cherry became housed on the same floor as Epic and myself. I observed Epic and Cherry talking together and spending time together.

Morales affidavit, ¶¶ 5–13 (numbers omitted) (brackets in original).

During the May 2004 hearing generated by the government's motion for reconsideration, at which Melendez testified for the government, counsel for the defendants "proffered the names of William Morales, Roy Castro, a/k/a 'Dela,' and Hector Vega as potential witnesses to refute Melendez's testimony that he was not familiar with this Court's new trial decision." Affidavit of Joyce London, counsel for Rodriguez, dated March 23, 2007 "London Aff." at ¶ 8. The government located and interviewed Castro and Vega, then in federal custody. Subsequently the prosecutors advised defendants' counsel that these individuals remembered seeing Melendez in possession of "a C & C opinion" (shorthand for the underlying case in which defendants were convicted). However, "Vega and Castro were not called as defense witnesses at the reconsideration hearing because neither could positively identify which opinion Melendez had read." London Aff. ¶ 16.[1] Morales's account differs in that respect, because it tends to identify an opinion Melendez read as *Camacho II*, granting defendants a new trial.

Morales was represented by attorney Gary Becker. "At or around the time of the hearing," Becker asked defendants' counsel "that Morales not be interviewed as Morales still had an open case." Becker "subsequently agreed that defense counsel could interview Morales at the MCC in the presence of his attorney."

London Aff. ¶ 11. For reasons that do not fully appear from the record, "[t]his interview did not take place until July 8, 2005." *Id.*, ¶ 12. At that interview Melendez gave the account which subsequently appears in his affidavit, quoted *supra*. Morales stated at the time of his interview "that he would be willing to sign an affidavit swearing to the truth of his statements, but his attorney requested that an affidavit not be signed and submitted until after Morales' sentencing which his attorney expected to take place relatively shortly." *Id.*, ¶ 14. However, Morales was not sentenced until July 12, 2006; defendants' counsel had to locate him in the Bureau of Prisons system; Morales received a copy of his proposed affidavit "in or around October 2006"; and "was unable to have his signature notarized for approximately two months," *id.*, ¶¶ 15, 17–18, circumstances which account for the notarization date of October 13, 2006.

Defense attorney London's affidavit also states that sometime after the May 2004 hearing, Mr. Sercarz, who as noted *supra* acted at one time as counsel for Cherry, "provided the defense with a document which had been given to him by Cherry, with the understanding that Sercarz would provide this document to counsel for Camacho and Rodriguez," London Aff. ¶ 19. This document was a copy of the *Camacho II* opinion. "According to Cherry's counsel, Cherry advised that both Cherry and Melendez had reviewed this document together. Furthermore, Cherry had indicated two specific pages of the opinion, the backs of which contain some handwriting." *Id.*, ¶ 21. One of these pages "contains a list of numbers which Cherry stated were written by Melendez." *Id.*, ¶ 23. With that commendable energy characterizing her representation of Rodriguez, Ms. London retained the services of fingerprint

---

1. Defense counsel did not interview Castro and Vega, but quite properly accepted the accuracy of the government's account of what they said.

and handwriting experts to examine the page of the document purportedly containing Melendez's handwriting. But the fingerprint expert "was unable to obtain any usable lifts," the partial lifts obtained being "too small and too contaminated to enable further identification processes to be performed"; and the handwriting expert "concluded that he could not definitively state that the numerals in question were written by Melendez." *Id.,* ¶¶ 24–27.

Defendants base their present motion for reconsideration upon the Morales affidavit they obtained in the circumstances I have recounted.

## II. DISCUSSION

### A. Timeliness

■ Initially, the government contends that defendants' present motion is time barred. "Despite being styled as a motion for reconsideration," the government argues in its brief at 10, defendants' submission "should be treated as a motion pursuant to Rule 33," by which the government means an initial motion for a new trial and as such untimely under the 1998 amendment to Rule 33, which requires a motion for a new trial based upon newly discovered evidence to be made "only within three years after the verdict or finding of guilty."

There is no substance to this argument. Defendants have made only one Rule 33 motion. In *Camacho I,* I held that the Court had jurisdiction over defendants' motion because it was timely under the prior version of Rule 33. The Second Circuit affirmed that ruling. *Camacho IV,* 187 Fed.Appx. at 35 n. 1 ("We hold that the district court had jurisdiction over the Rule 33 motion for the reasons expressed by the district court in its October 1, 2001 opinion [*Camacho I* ])." To be sure, as the government stresses, the litigation has been going on for years. But great oaks from little acorns grow. Both sides have

moved for reconsideration: the government previously, the defendants presently. Both motions have their genesis in and relate back to defendants' initial and timely Rule 33 motion.

■ As an alternative time-bar theory, the government contends that defendants' motion is untimely under Local Civil Rule 6.3, which requires that a motion for reconsideration of a court's decision on a *civil* motion "shall be served within ten (10) days after the docketing of the court's determination of the original motion." No persuasive or binding authority applies the 10–day civil procedural rule in a criminal case. That is not surprising. The litigation circumstances and interests involved are very different. And the 10–day argument comes with ill grace from the government, which waited almost six months after the Court filed its opinion in *Camacho I* on March 13, 2002 granting a new trial before moving for reconsideration on September 3, 2002. I hold that the prescriptive provision of Local Civil Rule 6.3 does not apply in criminal cases.

### B. May the Court Consider the Substance of the Morales Affidavit?

■ The government's next contention has more force. Defendants cannot, and do not, contend that the substance of the Morales affidavit constitutes newly *discovered* evidence. As noted *supra,* defendants' notice of motion refers to "newly *obtained* evidence." The different adjective is not accidental. At the time of the hearing on the government's motion for reconsideration in 2004, defendants' counsel knew about Morales and what he was prepared to say, identifying him as a potential witness who would refute Melendez. As appears from Ms. London's account, quoted in Part I, Morales's attorney would not allow him to swear to his account until he had been sentenced, which did not occur until 2006. Although Morales's evi-

dence was not *available* to defendants until 2006, it had been *discovered* by them in 2004.

Those circumstances implicate the Second Circuit's holding in *United States v. Owen*, 500 F.3d 83 (2007). Owen was decided after the main briefs on the present motion had been submitted. The government relies upon the case in a separate letter brief and defendants seek to distinguish it in their reply. The Second Circuit's opinion requires careful consideration.

The case arose on the motion of Owen, a convicted defendant, for a new trial under Rule 33. Owen's co-defendant, Samuels, chose not to testify at trial, but during his sentencing hearing made statements exculpatory of Owen, upon which Owen based his Rule 33 motion. The district court granted Owen a new trial. The Second Circuit reversed. It joined "the majority of circuits to have addressed the issue and hold that Rule 33 does not authorize district courts to grant new trials on the basis of such evidence since it is not newly discovered, but merely newly available." 500 F.3d at 89. Applying that principle to the facts of the case, the *Owen* court said:

> Owen was at all times aware of Samuels' ability to exculpate him, but was unable to benefit from Samuels' testimony because Samuels did not make it available until after the trial was over. In these circumstances, Samuels' testimony is not newly discovered evidence within the meaning of Rule 33.

(footnote and internal quotation marks omitted). The government contends that *Owen*'s distinction between newly discovered and newly available evidence precludes consideration of Morales's affidavit and accordingly is fatal to defendants' present motion to reconsider.

I do not understand defendants to deny that *Owen* would bar them from using the Morales affidavit to support an initial Rule 33 motion. But defendants observe that *Owen* "did not involve a motion to reopen and reconsider, but rather an initial Rule 33 motion," and argue that:

> The test to be applied in determining whether to reopen and reconsider a motion, however, is considerably different. It does not turn on whether Morales' proffered testimony was newly discovered, as the government insists, but rather on whether that testimony might cause this Court to reconsider its previous decision denying defendants' new trial motion.

Reply Brief at 9–10.

Defendants rely principally upon *United States v. Bayless*, 201 F.3d 116 (2d Cir. 2000), in which the government, horrified by the district court's decision to suppress seized evidence following a pre-trial suppression hearing, based a successful motion for reopening and reconsideration upon the testimony of one Sergeant Bentley, a police officer present at the seizure who did not testify at the hearing but whose existence and knowledge were fully known to the government at that time, The district court vacated its order suppressing the evidence. The defendant pleaded guilty but reserved her right to appeal on the suppression issue. The Second Circuit affirmed the conviction, reasoning that "the government adequately justified its decision not to introduce the testimony of Sergeant Bentley at the original hearing," and holding that the district court's "decision, in the interests of justice, to reopen the suppression hearing and to allow the government to introduce testimony of the officer in charge at the time of the arrest" was not in error. *Id.* at 131–32. Defendants contend that *Bayless* gives them the same right on their present motion to reconsider to call a witness known to them at the time of the original hearing.

*Owen* and *Bayless* both differ on the facts from the case at bar. As for *Owen*,

defendants correctly point out that the evidence was proffered on an initial Rule 33 motion; but Rule 33 remains the procedural vehicle for defendants' effort to obtain a new trial, and it seems counterintuitive to conclude that evidence defendants could not use on an initial Rule 33 motion is available to them on a motion to reconsider a district court's Rule 33 ruling. As for *Bayless,* the evidence at issue was offered by the government in support of its motion for reconsideration of a suppression order. Unlike a defendant's Rule 33 motion for a new trial, the rules imposed no requirement upon the government that its reconsideration motion in *Bayless* be supported by "newly discovered evidence," *Quaere* whether the defendants, moving for relief under Rule 33, can take advantage of *Bayless.*

While these factors may militate in favor of the government's effort to preclude the Court from considering the Morales affidavit, I conclude that the defendants are entitled to proffer and have the Court consider on *their* motion to reopen the evidence of yet another federal inmate (Morales) in order to cast doubt upon the evidence given by a different federal inmate (Melendez) proffered by the government and considered by the Court on *its* motion to reopen. I do not think that Second Circuit authority compels me either to accept or reject the Morales affidavit. I will consider the Morales affidavit in the exercise of my discretion, because I believe it is fair to do so.

**C. Does the Morales Affidavit Entitle Defendants to a New Trial Under Rule 33 or to Reopen the Hearing?**

█ In considering the effect of the Morales affidavit upon defendants' Rule 33 motion for a new trial, it is useful to recall that the decisive question is whether de-

fendants have shown sufficient corroborating circumstances indicating the trustworthiness of Cherry's statement to Thomas that he, not the defendants, committed the murders to satisfy Rule 804(b)(3) and make Cherry's statement admissible at a new trial. At the prior reopening hearing, Melendez testified for the government that while they were housed at the MCC, Cherry told him he had fabricated the account he gave to Thomas, in order to discomfit the prosecutors and help defendants gain a new trial. Melendez's testimony had an adverse effect upon defendants' efforts to comply with Rule 804(b)(3) with respect to the trustworthiness and admissibility of Cherry's statement to Thomas. Defendants now offer Morales's testimony in an effort to (a) to refute Melendez's testimony and (b) restore Cherry's asserted statements to Thomas to that state of grace in which it can be said that sufficient corroborating circumstances satisfy Rule 804(b)(3) and make those statements admissible at trial.

In *Camacho III,* and again in Part I of this opinion, I described four aspects of the evidence in the record that corroborated the truth of Melendez's testimony. If one accepts the truth of Morales's affidavit entirely, it addresses only one of those aspects: whether Melendez had read this Court's prior opinions at the time in 2002 when he was housed in the MCC with Cherry. Melendez testified at the May 2004 hearing that he had not read those opinions. Morales's affidavit states that prior to Cherry arriving at the MCC, Melendez showed him and other inmates this Court's opinion in *Camacho III* granting defendants a new trial.

Defendants do not allow for the possibility that during the two years between the events in question and his testimony, Melendez might have forgotten about reading the opinions.[2] Rather, the defendants'

---

2. Nor does the government urge possible memory loss in its briefs.

scenario is that when Cherry arrived at the MCC, it occurred to Melendez, having read *Camacho III*, that he could curry favor with the government by fabricating statements purportedly made by Cherry to him, in which Cherry asserted that he had fabricated the statements exculpating defendants that he had purportedly made to Thomas.

Defendants' scenario is not persuasive. It does not account for Melendez's description of what Cherry told him about his legal representation problems and concerns, revolving about Mr. Sercarz and leading to Cherry's hearing before Judge Stein. No prior reported opinion on that subject existed in 2002, when Melendez and Cherry were housed together in the MCC. One can only conclude that Melendez knew about Cherry's dissatisfaction with Mr. Sercarz and Judge Stein's appointing new counsel to represent Cherry because Cherry told him about it. And there is no reason to suppose that Cherry limited his statements to Melendez, telling him about his legal representation problems but saying nothing about fabricating his statements to Thomas. Melendez testified that Cherry covered both subjects in his first conversations with him after Cherry arrived at the MCC. I find that plausible, based in part upon my own observations of Cherry. Cherry is vain, articulate, boastful, angry, vengeful, always viewing himself as a victim, never a villain. I have previously said that making up statements exonerating defendants and confounding the government would come naturally to Cherry. So would boasting to a fellow inmate about his cleverness in combining with Thomas to concoct false statements in order to discomfit (Cherry would use a different verb) the government.

Defendants say that Morales's affidavit shows Melendez lied at the hearing about never having read the Court's prior opinions. The briefs of counsel condemn Melendez as having perpetrated a fraud upon the Court which requires the Court to disregard his testimony entirely. In effect, the defendants invoke the maxim *falsus in unum, falsus in omnium*. That maxim may be applicable in some circumstances, But I decline to apply it here, where significant portions of Melendez's account of what Cherry told him must be true.

Accepting the truth of Morales's affidavit in its entirety, the most defendants can derive from it is that Melendez lied about not reading the Court's opinion in *Camacho III*, That evidence does not address the core question. All Morales says about his contacts with Melendez is that Melendez "gave me this opinion [inferentially *Camacho II* ] to read." All Morales says about Cherry is that after he arrived at the MCC, Morales "observed Epic [Melendez] and Cherry talking together and spending time together" (an observation entirely consistent with the government's scenario). Morales does not say in his affidavit that either Melendez or Cherry said in words or substance that Cherry acknowledged he was the shooter, or that his self-incriminating account to Thomas was anything other than a fabrication.

There are other sources of corroboration of Melendez's testimony that I have previously described and need not do so again.

After a review of the record, including the Morales affidavit, I conclude that defendants have failed to show circumstances corroborating Cherry's purported statements to Thomas sufficient to satisfy Rule 804(b)(3) and render those statements admissible in evidence. Accordingly, I adhere to my prior opinion and order in *Camacho III*. No further evidentiary hearing is required. Defendants' motion for

reconsideration is DENIED. Their motion for a new trial is also DENIED.[3]

It is SO ORDERED.

---

3. I do not find it necessary to determine the effect, if any, of the Second Circuit's opinion in *Camacho IV*, affirming *Camacho III*, upon the viability of defendants' present motion, a question debated at some length in the briefs. This opinion assumes that *Camacho IV* has no direct effect upon the issues discussed in text.